## NEW YORK LIFE INS. CO. v. ALLISON.

(Circuit Court of Appeals, Second Circuit. February 27, 1901.)

### No. 80.

1. FEDERAL COURTS—FOLLOWING STATE DECISIONS—LAW OF FIXTURES.
   The federal courts adopt as the rule of decision as to fixtures the local law as established by the decisions of the courts of the state where the property is situated, when such decisions are explicit and uniform.[1]

2. FIXTURES—LAW OF NEW YORK.
   Under the decisions of the New York courts, a machine does not become a part of the realty by merely attaching it to a building, without the intention to make it a permanent accession, when it is not so incorporated with the building as to lose its identity or to render its removal injurious to the building, unless it is essential to the use to which the part of the building in which it is connected is appropriated.

3. SAME—ELECTRIC LIGHTING MACHINERY.
   Where a building was piped for lighting with gas, and also equipped with an electric lighting system, prepared for connection with the street supply, dynamos and engines for driving the same, installed in the building from considerations of economy only, and not from necessity, which were used for no other purpose than to supply electricity for use in the building, and which could be removed without difficulty or injury to themselves or the building, and were susceptible of use either singly or together in any other building, did not become a part of the realty, so as to pass under a prior mortgage, as against a purchaser of such machinery from the mortgagor.

4. SAME—SWITCH BOARDS, CHANDELIERS, AND SIGNS.
   Electric lighting fixtures used in and about a theater building, and detachable without injury thereto, such as switch boards used to connect a dynamo with the permanent wiring of the building, chandeliers, and an electric sign, all of which are capable of being used elsewhere, are not a part of the realty, but chattels, under the law of New York.

5. SAME—THEATER CHAIRS.
   Upholstered turn-over theater chairs, arranged in an auditorium in rows, in the usual manner of seating such rooms, and fastened to the floor by screws, being essential to the use for which the room is designed, are presumably intended as permanent attachments to the building, and are a part of the realty, as between mortgagor and mortgagee, unless circumstances indicating a contrary intention are shown.

6. SAME—STAGE SCENERY.
   Stage scenery used in a theater, consisting of loose articles which can as well be used in another theater, is personal property.

7. SAME—WALL MIRRORS.
   Large mirrors placed around the walls of a room used for public purposes when the building was constructed, forming panels finished in harmony with the remainder of the room, and which cannot be removed without leaving the room dismantled and unfinished in appearance, are a part of the building.

---

[1] State laws as rules of decision, see notes to Griffin v. Overman Wheel Co., 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.

**3. SAME—PUMPING ENGINES.**

Whether pumping engines used in a theater building to pump water into tanks on the top of the building, and to keep filled the standpipes required by the law of the state to be maintained in such buildings, where they are removable without injury to the building, are a part of building, and realty as between mortgagor and mortgagee, is a question of fact, depending to some extent upon whether or not they are essential to the proper equipment of the building, and not alone upon the intention of the owner. Where they are only a matter of convenience, and the building contains other pumps which can be used for the same purposes, effect may be given to the intention of the owner that they should remain personal property, but otherwise they are not removable from the building.

**9. CONVERSION—TRIAL—FURNISHING JURY WITH LIST OF PROPERTY.**

In a suit for conversion, to recover the value of a large number of articles claimed as personal property by plaintiff, it is proper for the court to submit to the jury a schedule of the articles in controversy, to aid them in fixing the value of the property, provided such schedule conforms to the evidence.

In Error to the Circuit Court of the United States for the Southern District of New York.

Edward E. McCall, for plaintiff in error.

A. J. Dittenhoefer, for defendant in error.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The plaintiff in error was the defendant in the court below, and brings this writ of error to review a judgment for the plaintiff entered upon the verdict of a jury in an action brought to recover for the conversion of personal property. 101 Fed. 1007.

One Hammerstein on the 20th day of April, 1896, executed to the defendant a mortgage upon certain real estate situate in the city of New York, which included the building known as the "Olympia Theater." Default having been made in the payment of the mortgage debt, a foreclosure action was brought, and upon a decree rendered in that action the defendant purchased and became the owner of the mortgaged premises. After the execution of the mortgage, and before the decree of foreclosure, the mortgagor executed a bill of sale to one Lissner of all the goods, chattels, and fixtures within the theater building, described in a schedule annexed to the instrument; and thereafter Lissner, by a bill of sale, transferred the personal property in controversy to the plaintiff.

The principal issues litigated upon the trial were as to the title and value of the property; the defendant contending that most of the articles were fixtures, and passed as part of the realty by the purchase under the foreclosure decree. The jury, under the instructions of the court, rendered a special verdict specifying the particular articles which they found to be chattels as distinguished from fixtures, their respective values, and the aggregate value. As to some of these articles they were instructed by the court to find in favor of the plaintiff. As to others the question whether the articles were fixtures was left to them as one of fact, under general instructions as to the law applicable to the evidence. These instructions of the trial judge are impugned by the assignments of error.

A general statement of the facts as disclosed by the evidence, and the rules of law applicable, should preface a consideration of the assignments of error. It appeared upon the trial that the theater building had been fully equipped by Hammerstein prior to the date of the mortgage. It was subdivided into four places of amusement, —the music hall in the northern half of the first floor, the theater proper in the southern part of the first floor, the concert hall in the center, and the roof garden over all. The building was lighted by its own electric plant, being lighted throughout, and provided with chandeliers wherever needed, including the electrolier, 35 feet in length, and having a spread of about 20 feet, suspended in the concert hall. The electric current was supplied by dynamos located in the basement, driven by steam engines. The building was also piped and prepared for being lighted by gas. It was heated by steam, both the direct and the indirect systems being used. Electric signs were fastened to the outside of the building, equipped with letters for use to advertise the name of the theater and the plays being presented. As the city water could not rise to the top of the building, two large tanks were constructed there, supplying standpipes with water for protection against fire, and for supplying pipes leading to the stages for the production of water effects. The tanks were supplied with water by two pumping engines connected with boilers in the basement,—one under the stage of the music hall, and the other under the stage of the theater. The music hall was provided with ventilating fans for cooling purposes, and there was a ventilating fan in the basement, all actuated by electricity. The concert hall was fitted up with 10 large mirrors, the walls of the room being nearly covered by them. Throughout the building there were chairs and seats for the accommodation of the audiences. The stages were supplied with scenery, draperies, movable platforms, and stage properties.

In determining what annexations to real property, of chattels, constitute a part of the realty, the federal courts ascertain the local law of real property by the decisions of the courts of the states in which the property is situated, and, when these decisions are explicit and uniform, adopt them as the rule of decision. Davis v. Mason, 1 Pet. 503, 7 L. Ed. 239; Hinde v. Vaitter, 5 Pet. 398, 8 L. Ed. 168; Suydam v. Williamson, 24 How. 427, 16 L. Ed. 732; Williams v. Kirtland, 13 Wall. 306, 20 L. Ed. 683. The general rule derived from the decisions of the courts of New York is that unless the annexation is one of a permanent character, so that the machine or other chattel cannot be removed without substantial injury to the freehold, or unless the annexation is of a machine or chattel especially adapted for use in the particular place where it has been put, the purpose of the annexation and the intention with which it has been made are the most important considerations, and are the determining criterion, whether it is a fixture or a chattel. In McRae v. Bank, 66 N. Y. 489, the court of appeals used this language:

"If the article is attached for temporary use, with the intention of removing it, a mortgagee cannot interfere with its removal by the mortgagor. If it is placed there for the permanent improvement of the freehold, he may.

The mode of annexation may, it is true, in the absence of any proof of intention, be controlling. It may be in itself so inseparable and permanent as to render the article necessarily a part of the realty, and, in case of less permanent mode of attachment, may afford convincing evidence that the intention was that the attachment should be permanent; as, for instance, where the building is constructed expressly to receive the machine or other article, and it could not be removed without material injury to the building, or the article would be of no value except for use in that particular building, or could not be removed therefrom without being destroyed or greatly damaged." "These are the tests which have been frequently applied in determining whether the annexation was intended to be temporary or permanent, but they are not the only ones. Nor is it indispensable that any of these conditions should exist."

After reviewing some of the leading cases which discuss the criterion of a fixture, the court said:

"The object, and not the method of the attachment, appears to be the controlling factor."

The decisions of the New York courts are in harmony with the general trend of the, adjudications elsewhere, and are to the effect that a machine does not become a fixture by merely attaching it to a building, without the intention to make it a permanent accession, when it is not so incorporated with the building as to lose its identity, or render it difficult or injurious to the building to remove it, or when it is not essential to the use to which the part of the building in which it is connected is appropriated. Murdock v. Gifford, 18 N. Y. 28; Potter v. Cromwell, 40 N. Y. 287. The annexation is treated as of a permanent nature when the building is to be devoted to the purposes for which the machinery is to be used, and is not complete in the absence of the machinery.

Error is assigned of the instructions of the trial judge in respect to the dynamos and engines, their belts and connections. The jury found that the plaintiff was entitled to recover the value of "four dynamos," $5,510; "wiring from the dynamos to the main switch board in the cellar," $380; "two engines in cellar," $5,700; "engine belts," $380; "connections, consisting of pipes, valves, drip pans, etc.," $570. The dynamos were used solely for producing the electricity used in lighting and ventilating the building. They were connected to the engines by belts, and with the wiring of the building by wires running to the cellar switch board. They weighed about one ton each, rested on iron rails having wooden slips, and were bolted to the rails. The rails rested on a foundation of masonry. The engines to which the dynamos were connected rested on slabs of granite supported by a foundation of masonry, and were bolted to the slabs. The dynamos and engines were removable by unfastening the nuts of the bolts. There was a conflict of evidence as to whether the engines were used solely to run the dynamos, some evidence being given tending to show that they were also used to furnish exhaust steam for the heating system. It was proved that the building was originally wired for obtaining the electricity from one of the lighting companies whose wires were in the adjoining street; that electricity was obtained from this source for a time, but for economic reasons the street supply was discontinued and the dynamos and engines were substituted. The trial judge instructed the jury, in substance,

that the dynamos and their connections were chattels, not fixtures, and that the engines and their connections were chattels, not fixtures, unless they found that they were to some extent a part of the heating system of the building, and if they so found they were fixtures.

The dynamos and engines were not especially adapted for use in this particular building, were susceptible of use either singly or jointly with their connections in any other building or place where such machines are operative, and could be removed without difficulty and without any injury to the building or themselves. The circumstances that the building was prepared to be lighted with gas, that its electric lighting system was prepared for connection with the street supply, and that the dynamos and engines were introduced into the building upon considerations of temporary economy, and not of necessity, are quite controlling. We are satisfied that in his instructions to the jury in regard to the dynamos, the engines, and their connections, the trial judge committed no error of which the defendant had a right to complain.

Error is also assigned of the instructions of the trial judge in regard to the chandeliers (including the dome chandelier or electrolier) and switch boards and electric signs. The jury found that the plaintiff was entitled to recover for the value of "chandeliers, gas and electric fixtures," $9,025; "four brass gas and electric chandeliers bought at Hotel Logerot," $1,425; "wiring and fitting fixtures bought at Hotel Logerot," $285; "four switchboards,—one large one in the cellar, and three small ones in upper part of building,"—$760; "three electric signs outside of theater," $285. The trial judge instructed the jury that all these articles were chattels, not fixtures. There was no disputed question of fact in respect to the character of these articles. The electric fans were screwed to the woodwork. The switch boards were removable without injuring the building or interfering with the part of the wiring system incorporated into the walls. Their only office was to connect the dynamos with the wiring system. The chandeliers were combination gas and electric lighting fixtures, detachable in the usual manner of electric lighting or gas fixtures. In McKeage v. Insurance Co., 81 N. Y. 38, the court of appeals said:

"Gas pipes which run through the walls and under the floors of the house are permanent parts of the building, but the fixtures attached to these pipes are not. They are not permanently annexed, but simply screwed to projections of the pipes from the walls left for that purpose, and can be detached by simply unscrewing them. * * * All these articles were, in their nature, mere furniture, and therefore chattels, and not appurtenances to the building. * * * They no more constituted a part of the latter than would pictures supported by fastenings driven into the wall."

See, also, Shaw v. Lenke, 1 Daly, 487; Lawrence v. Kemp, 1 Duer, 363; Walker v. Sherman, 20 Wend. 645; Manning v. Ogden, 70 Hun, 399, 24 N. Y. Supp. 70.

By analogy, while the wiring of an electric lighting system would be a part of the realty, the chandeliers and their appurtenances not permanently affixed to the building would be chattels, and not realty. On the same principle the other contrivances constituting a part of the lighting apparatus, not specially adapted to the particular building, but susceptible of use elsewhere as well, and readily detachable,

would not be fixtures. The fact that the electrolier was a chandelier of exceptionally large dimensions is immaterial. The electric signs were no more a part of the building than are ordinary signs when not affixed as permanencies. If the letters with which they were supplied had been merely capable of advertising the name of the particular theater, a different conclusion would be reached. We conclude that the instructions of the trial judge were correct, and that these assignments of error were not well taken.

Error is also assigned of the instructions of the trial judge in regard to the chairs and benches. The jury found that the plaintiff was entitled to recover for the value of "1,499 chairs in music hall and theater," $2,137.50; "400 benches in the roof garden," $475. The evidence upon the trial was that the chairs were not made especially for the building, but were bought, already made, of a manufacturer of furniture. Some of them were used in the offices, some in the dressing rooms, some in the concert hall and roof garden, and some in the auditorium of the theater. Except the auditorium chairs, all the chairs and benches were loose. The auditorium chairs were turn-over chairs, upholstered in plush, and of the mechanical construction adapting them to be placed in rows and secured to the floor. They were placed over the carpets in rows, and fastened to the floor by screws. The evidence indicated that there were from 600 to 1,000 of these chairs, and the jury found their average value at $1.44 each. The trial judge left to the jury the question whether these auditorium chairs were fixtures, under instructions that were, in substance, that if they were so attached as to become part of the realty, and to indicate an intention that they were to remain permanently, they were fixtures; otherwise, they were not. It would seem that chairs attached and arranged substantially as these were are essential to the uses to which an auditorium is appropriated. We think he should have instructed them that, attached as they were, if they were, as to size, upholstering, mechanical construction, and general arrangement, adapted to conform to the auditorium, that fact would indicate an intention that they were to be regarded as fixtures. Grosz v. Jackson, 6 Daly, 463. In Concert Co. v. Sperry, 9 N. Y. St. Rep. 342, affirmed in 120 N. Y. 620, 23 N. E. 1152, where the chairs of a theater were secured to the floor by screws, the question whether they were fixtures arose between lessor and lessee under a provision of the lease that at the end of the term "all additions, alterations, and improvements on the premises should remain a part thereof and be surrendered to the lessor"; and the court held that the provisions of the lease did not change the character of the chairs from personalty to realty. In this case, however, it appeared that the lessee purchased the chairs under an agreement with the vendor by which the latter was to have a chattel mortgage upon them for the purchase price, and the chattel mortgage was executed to the vendor shortly after the chairs were placed in the theater. No other New York adjudications applicable to the case have been cited. In Andrews v. Chandler, 27 Ill. App. 103, it was held that theater chairs fastened to the floor of an opera house were personal property, and not covered by a mortgage of the real estate; but the decision

was placed upon the ground that when the chairs were purchased the mortgagor made an agreement with the vendor to secure the purchase price by a chattel mortgage upon them, and that he would insure them, "loss, if any, payable to" the vendor.

The evidence in regard to the particular adaptation of the chairs to the auditorium was quite meager. If they were arranged as they generally are in such rooms, occupying the whole area of the auditorium when divided into the necessary aisles, we think, in view of the other evidence, that it should have been ruled, as matter of law, that they were fixtures. An auditorium without seating capacity would be incomplete, and the chairs as generally arranged and constructed in such a room are essential to the use to which that part of the building is appropriated. The exception by the defendant to the instructions of the judge in respect to the auditorium chairs was a general one, and the request for further instructions could not have been properly granted, following the phraseology in which they were made; and it is doubtful whether the exceptions are sufficient as the basis of assignments of error.

Error is assigned of the instructions of the trial judge to the jury in respect to the stage scenery. He instructed them that inasmuch as this consisted of loose articles, made to be hung up and taken down, all the articles were personalty. There was no evidence that the scenery and these other articles were not as susceptible of use in any other theater as in this one. They were merely furniture, just as the pictures hung upon the walls and used in representing in a play a furnished room would be furniture and not fixtures.

Error is also assigned of the instructions of the trial judge to the jury in respect to the mirrors. The jury found that the plaintiff was entitled to recover for "10 beveled mirrors in concert hall," $902.50. The trial judge instructed the jury, in substance, that the question in respect to these mirrors was whether they were set up in front of the walls, or as a part of the walls; that, if they were put there as intended to be a part of the walls, they would be real estate; on the contrary, if they were set up by the walls in front of them, although they were finished off to correspond with the room, they would be personal property; and, if they could be taken away without disturbing the wall, it was immaterial that the wall might be thereby left unfinished in appearance. To these instructions the defendant excepted. The proof was that the mirrors were put in during the construction of the building. They encircled the room in panels, and formed practically a mirrored room. Wooden strips forming panel frames were imbedded in the plastering of the walls. The strips were covered with an ornamented papier-maché molding, except at their inner edges. The frames of the mirror were decorated similarly to the molding on the strips. The mirrors were placed on and screwed into the uncovered edges of the underlying strips, and moldings ornamented like those on the strips and on the mirror frames were fastened over the outside edges of the frames. Thus the whole constituted a decorated panel ornamented by designs corresponding with the decorations throughout the room. The evidence left it in doubt whether there was any plaster within the space inclosed by

the wooden strips. Hammerstein testified that when he put the mirrors in he expected to occupy the building permanently, and intended them to be a permanent part of the building so long as he should occupy it. Unlike ordinary mirrors supported by hooks or equivalent fastenings driven into the walls, and which can be detached from such supports without disturbing the walls, these mirrors were so attached as to become practically integral with the walls. They were intended to be, and were in fact, a part of the decoration of the room, necessary to complete the design and architectural finish of the room. They were put into the room with the intention that they should be a permanent accession. They could not be removed without leaving the whole room dismantled and unfinished in appearance. We are satisfied that they were fixtures, and that the evidence was so persuasive as to leave no question of fact for the jury. Cahn v. Hewsey (Super. N. Y.) 29 N. Y. Supp. 1107; Rogers v. Crow, 40 Mo. 91; Connor v. Squiers, 50 Vt. 680. The assignments of error founded upon the exceptions to the instructions of the trial judge are well taken.

Error is also assigned of the instructions of the trial judge in respect to the pumping engines. The jury found that the plaintiff was entitled to recover for "two pumping engines under the stage," $475; "connections for pumping engines," $95. These engines were located, one underneath the stage of the music hall, and one underneath the stage of the theater. They had no connection with the boiler pumps, or with pumping water from the cellar, or with running the elevators, all this having been done by pumps which were not in controversy; but they were used for the purpose of pumping water (presumably obtained from the street supply) into the tanks located on top of the building, and to fill the standpipes, in order that there would be a water supply for three uses,—in case of fire, for extinguishing the fire; for stage performances that required a water effect; and for spraying the building for cooling and cleaning purposes. They were attached to the floor or foundation of the building by bolts, and were detachable by unfastening the nuts. Hammerstein testified that it was not his intention that these pumps should become a permanent part of the building, that the other pumps would have supplied everything needed, and that these were additional pumps put in merely for convenience. The trial judge instructed the jury that these pumps and their connections were personalty, and the defendant excepted. We think this instruction was erroneous. There was a question of fact whether the other pumps would have supplied everything needed, and whether these were merely convenient accessories. The other pumps were connected with the heating system of the building. Presumably they were indispensable to that system, and no facts were shown to indicate how they could have been used in lieu of the pumping engines in controversy. The testimony of the mortgagor as to his personal intention, however competent and persuasive it may be, is not conclusive, when the question is whether machinery attached to and connected with the building is a fixture, when the machinery is essential for the purposes for which the building is to be used, and when the building would be incomplete without it. This

machinery, or similar machinery, was indispensable to the use of the water tanks and standpipes, and these parts of the system were indispensable to the ordinary uses of the building as a theater, and without them the theater would not have been equipped according to law. The consolidation act (section 500) enacts that every theater "shall provide stand pipes which shall be kept constantly filled with water by means of an automatic pump or pumps." We think the trial judge should have submitted the question to the jury, with instructions giving due effect to the intentions of the mortgagor if they believed the testimony of Hammerstein.

Error is also assigned of the ruling of the court in submitting to the jury the list of articles or schedule on which they were instructed to base their verdict. The articles in controversy were so numerous that, without the schedule to refer to, it would have been impracticable for the jury to render an intelligent verdict. The course adopted by the trial judge in having a schedule prepared for and left with the jury, and in directing them to find specifically as to each article and as to its value, was judicious. But the schedule left with the jury was one prepared by one of the witnesses, and in one respect, at least, did not conform to the evidence. According to the evidence, the whole number of chairs and of roof-garden benches was 1,499. In the schedule submitted to the jury there were stated to be 1,499 chairs and 400 roof-garden benches. The jury found that the plaintiff was entitled to recover for the value of the roof-garden benches $475, as well as for 1,499 chairs. The objection made by the defendant to submitting the schedule to the jury was a general objection, and the inaccuracy of the schedule was not suggested. While it is evident that the jury was misled by the use of this schedule into a recovery against the defendant for $475 more than the plaintiff was entitled to, the assignment of error is not well taken, because the objection and exception upon the trial was not sufficiently specific.

We have thus considered all the assignments of error which are discussed in the brief of counsel for the plaintiff in error. It has seemed proper to do this for the information of the court below in the event of another trial, notwithstanding our conclusion that the validity of some of the assignments of error must lead to a reversal of the judgment.

If the judgment should be reduced to the extent of the recovery for the mirrors, the pumping engines and their connections, the roof-garden benches, and 1,000 auditorium chairs, the rights of the defendant, upon the evidence, would be fully protected. If the defendant in error stipulates to reduce the judgment accordingly, the judgment will be modified, and as modified affirmed, but with costs of this court against the defendant in error; otherwise, the judgment will be reversed, with costs.

Ordered accordingly.