### MURRAY v. BENDER.

#### (Circuit Court of Appeals, Ninth Circuit. September 14, 1903.)

#### No. 836.

1. FIXTURES—THEATER FURNISHINGS—ATTACHMENT TO BUILDING BY STOCK-HOLDER OF CORPORATION OWNER.

Where the owner of a majority of the stock of an opera house company which owned the land on which an opera house was situated, for his own benefit as a stockholder and without any agreement with the company, placed certain personal property in the building, consisting of chairs, stage appliances, drop curtain, etc., all of which were annexed to the building and were essential to its use for the purpose for which it was built and adapted, such articles became fixtures, which passed to an execution purchaser of the realty as a part thereof.

Appeal from the Circuit Court of the United States for the District of Montana.

See 109 Fed. 585, 48 C. C. A. 555; 116 Fed. 813, 54 C. C. A. 317.

In Murray v. Bender, 109 Fed. 585, 48 C. C. A. 555, this court had before it nearly all of the facts involved in this case. The decree of the lower court in this case was also before this court in King v. Bender, 116 Fed. 813, 54 C. C. A. 317, and the judgment of this court on that appeal has disposed of one of the questions involved in the present appeal. A statement of the facts in this case appears to be necessary to a clear understanding of the law of

the case, as established by the previous judgment of this court, and the remaining questions to be determined on this appeal.

In the year 1888 the Grand Opera House Company, a corporation, was the owner of certain real property in the city of Butte, in the then territory of Montana. On September 29, 1888, the corporation conveyed the premises to one John Maguire, taking from him a note secured by a mortgage for the purchase price, amounting to $17,000. After the execution, delivery, and recording of this mortgage, Maguire undertook the erection of an opera house upon the mortgaged premises. In the construction of this building Maguire incurred considerable indebtedness for labor performed and materials furnished for the building, resulting in the creation of liens upon the property under the statute of the state. These liens were in due course of proceedings foreclosed by a decree dated January 27, 1890, and the property sold thereunder on the 19th day of May, 1890. On April 10, 1891, the appellant, Murray, who was the last of several redemptioners from such foreclosure sale, became invested with the title to the property by sheriff's deed. On May 29, 1891, the Opera House Company commenced an action for the foreclosure of its mortgage upon the property, executed by Maguire in 1888. In this action Murray was made a party defendant, and in a decree entered on March 12, 1895, it was adjudged that the mortgage lien upon the land was superior to the title of Murray, but, as to the building, Murray's title was adjudged to have priority over the mortgage lien. It was further adjudged and decreed that Murray might at any time after the sale of the premises, and before the expiration of the period for redemption as provided by law, remove from the said premises the building and improvements thereon; but, if he should fail to do so within the time prescribed, then the building and improvements should become a part and portion of said lots, and, after the time for removal specified in the decree, Murray should have no right to remove said improvements, or any of them. This decree was affirmed by the Supreme Court of the state on appeal. Opera-House Co. v. Maguire, 14 Mont. 558, 37 Pac. 607. The premises were sold, pursuant to the decree, on April 18, 1896, and were purchased by the Grand Opera House Company. The right to redeem from this sale expired under the law of the state on October 18, 1896, but prior to that time negotiations were had between Murray and the Grand Opera House Company for either a purchase or sale that would vest the ownership of the entire property in one of the parties. But the negotiations failed, and Murray proceeded to remove the chairs, scenery, and other furniture from the building, and the building from the lot. The chairs, scenery, and other furniture were removed to a warehouse, and when Murray had torn down the front end of the building it was suggested to him that he could buy a controlling interest in the stock of the Opera House Company, which would be much better than removing the building, as the building was of brick. Murray thereupon bought 1,000 or 1,100 shares of the stock of the corporation, which gave him the controlling interest in it. He then suspended the removal of the building, and proceeded to reconstruct it. When the building was reconstructed, Murray had the chairs, scenery, and other furniture removed to the opera house. This removal was completed by December 3, 1896, and on December 10, 1896, the opera house was opened to the public.

On December 3, 1896, John O'Rourke commenced an action against the Grand Opera House Company, joining in his complaint two causes of action, one upon the promissory note of the corporation for $762, the other for $585, claimed by O'Rourke to have been paid out by him for the corporation. On the same day, under writ of attachment issued in said cause for both causes of action, the property of the Opera House Company was attached. The corporation appeared and answered the complaint, not controverting the first cause of action, but denying the facts alleged as to the second. On September 16, 1897, judgment was rendered for O'Rourke on the first cause of action, and the case continued pending as to the other. Upon the judgment so made and entered an execution was issued, and upon December 27, 1897, the attached property was sold by the sheriff to Silas F. King. On December 3, 1896, the same day on which O'Rourke's action was begun, John O. Bender, the appellee in the present case, began an action against the corporation upon three causes of action, aggregating $700, and on the same day attach-

ment was issued upon his complaint, and thereupon the property of the Opera House Company was attached, subject to the attachment of O'Rourke. The appellee obtained judgment in his action on May 21, 1898. On December 3, 1896, John F. Forbis also began an action against the corporation to recover $500. On the same day he also caused a writ of attachment to issue and the same property to be attached. His attachment was subsequent to those of O'Rourke and the appellee. On May 21, 1898, Forbis obtained a judgment against the Opera House Company in his action. On December 27, 1898, 12 months after the sale to King, O'Rourke, claiming to have a right of redemption upon his attachment still subsisting for his controverted cause of action, which continued pending after judgment had been entered upon his first cause of action, tendered to King the amount of the purchase money which the latter had paid, together with the statutory interest thereon, for the purpose of redeeming the property. On the same day the appellee served upon the sheriff of the proper county his notice of redemption, and under his said notice paid to the sheriff, for O'Rourke, the amount of money which O'Rourke had tendered to King, together with the amount which O'Rourke claimed to have been secured by his attachment. The appellee, then, as agent and attorney for O'Rourke, receipted to the sheriff for the money which he had tendered for O'Rourke, and as the agent for O'Rourke received the same. These redemptions were made within one year from the date of the sale under execution, that being the time allowed by the Montana law for redemption from execution sales. On January 10, 1899, and within the 60 days allowed by law to redeem from a redemptioner, Forbis, upon his judgment, redeemed from the redemption made by O'Rourke and the appellee. On January 19, 1899, notwithstanding these redemptions, the sheriff executed to the appellant, as purchaser under the O'Rourke judgment, a deed to the premises in controversy. On February 25, 1899, Forbis conveyed back to the appellee all rights which he acquired under his redemption. On April 4, 1899, J. O. Bender instituted a suit against King and McFarland in the Circuit Court of the United States for the District of Montana, praying that the latter be declared trustees for him as to all rights acquired under the sheriff's deed. The answer of the defendants denied that O'Rourke, at the time when he attempted to redeem said property, was a creditor of the corporation having a lien against the property subsequent to that upon which the same was sold, or that under said attachment lien he redeemed the property from sale, and denied that the attachment lien of the appellee was subsequent to the judgment and attachment of O'Rourke, and denied that the appellee, under his judgment, redeemed said property from the sale to King, or from the redemption attempted to be made by O'Rourke, and denied that the attachment of Forbis was subsequent to the lien on which the property was sold on execution, and denied that Forbis redeemed from said sale or from said attempted redemption. The defendant McFarland alleged that he was in possession of the property under a lease from, and that he was paying rent to, the Grand Opera House Company. The decree of the lower court was in favor of Bender, and King appealed. On appeal, this court affirmed the judgment of the lower court, and found all the facts in favor of Bender, decreeing him to be the owner of the real property, and that King held the same in trust for him. King v. Bender, 116 Fed. 813, 54 C. C. A. 317.

In this suit the lower court appointed a receiver, who took possession of the property and collected the rents from February 1, 1900. Murray had received these rents up to this time, and insisted that he should still collect them, and also claimed to be the owner of the seats, fixtures, scenery, etc., in the opera house, claiming this property as personalty and not a part of the realty; whereupon the court ordered that Murray be made a party to this suit. On September 23, 1899, the complainant, Bender, filed an amended bill, making James A. Murray and the Grand Opera House Company defendants. In this bill Bender alleged the facts hereinbefore recited, and further alleged that the defendant Murray claimed the chairs, stage scenery, and other fixtures in the opera house, but that the same were annexed to the realty and necessary for the use of the property, and that the same were devoted to such use when the attachments were made on December 3, 1896. The bill recited that McFarland, one of the defendants, obtained his possession of the property under a written lease executed by the Opera House

Company on November 1, 1898, through and from the defendant James A. Murray, and that the property which Murray then claimed as his individual property was leased and described as the property of the Opera House Company; that since Bender notified McFarland that he (Bender) was the owner of such property, McFarland had paid of the rents to the Grand Opera House Company a sum in excess of $6,000, and that Murray, through and from the Opera House Company, had received the whole of said sum, and unjustly held the same from complainant; that Murray and the Opera House Company held the rents, issues, and profits in trust for complainant.

In the answer to the amended bill Murray admitted the material matters of record set up in the bill, but alleged that certain property in the opera house, consisting of chairs, scenery, lamps, etc., was personal in its character, and belonged to him; alleged that McFarland was the tenant in possession of the opera house, and denied that the chairs and scenery were fixtures or annexed to the realty or necessary to its use, and denied that the Grand Opera House Company ever was the owner of such chairs, scenery, etc.; denied that McFarland procured the lease on the property through him, but admitted that McFarland had paid certain rents under said lease to the Opera House Company, the exact amount being at the time unknown to the defendant; denied that he had received from the Opera House Company the whole of said sums so paid, or that he unjustly or at all held the same from the complainant, or that he knew that the Opera House Company was not entitled to said rents from said property. He then alleged that since 1896 he had been the owner and in possession of the personal property in the opera house, consisting of chairs, scenery, etc., saving and excepting a few certain pieces of scenery; that McFarland never had any possession of such property except as the lessee of Murray; and that McFarland agreed to pay him rent therefor.

The decree of the court below, entered on the 4th day of September, 1901, adjudged that the complainant, John O. Bender, was the rightful owner and entitled to have and possess certain premises described in the bill of complaint as the property of the Grand Opera House Company, together with the tenements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining thereto, including the stage fixtures and appliances attached to the stage, the drop curtain attached thereto, and the chairs attached and fastened to the floor by screws and nails, but not including the scenery in the said house, nor the pianos therein, nor the loose and unattached chairs. It was also adjudged that the complainant was entitled to the rents, issues, and profits of the said property from and after the 11th day of March, 1899, the day that Bender was entitled to the sheriff's deed, to the 1st day of February, 1900, when the receiver took possession of the property, and that the defendant James A. Murray account for and pay over to the complainant the rents, issues, and profits of the said premises, with legal interest thereon from the time the same were withheld, and that said account be referred to the master in chancery, who should take evidence thereon and state said account, and report to the court said evidence and his conclusions thereon. In pursuance of this reference the master in chancery took evidence upon the question of rents, issues, and profits due from the defendant James A. Murray to the complainant, John O. Bender, and thereupon found that the defendant James A. Murray had received, from the 11th day of March, 1899, to the 1st day of February, 1900, $480 for each month of said period of 10 months and 18 days, to wit, the sum of $5,120, and that the complainant, John O. Bender, was entitled to receive from the defendant James A. Murray, under the decree, the said sum of $5,120, and interest, as particularly specified in the findings, from the time therein mentioned to the day of judgment therein. The report of the master and his findings were returned and filed and entered in the office of the clerk of the court on the 9th day of December, 1901, and, no exceptions having been filed thereto by either party within one month thereafter, the report stood confirmed on the next rule day, as provided in equity rule No. 83. Upon this confirmed report of the master, the court entered a further decree on the 20th day of March, 1902, adjudging that the complainant, John O. Bender, have and recover of the defendant James A. Murray the sum of $6,191.80, being the amount found due by the said master in chancery, together with legal interest at the

rate of 8 per cent. per annum upon the several amounts and for the several dates set forth in said report, as ascertained and computed to the date of the entry of the decree.

From these two decrees the defendant James A. Murray has appealed to this court, assigning as error: First, the action of the court in adjudging that the complainant, J. O. Bender, was the rightful owner and entitled to the possession of the premises described in the complaint as the property of the Grand Opera House Company, including the stage fixtures and appliances attached to the stage, the drop curtain, and the chairs mentioned in the decree, and in not determining that they belonged to the defendant; second, the action of the court in determining and adjudging that the complainant was entitled to the rents, issues, and profits of the property described therein, from and after the 11th day of March, 1899, and until the time when the receiver received the rents, issues, and profits, to wit, the 1st day of February, 1900.

J. C. Campbell, W. H. Metson, L. S. B. Sawyer, T. H. Breeze, John J. McHatton, and John W. Cotter, for appellant.

Crittenden Thornton, L. O. Evans, and John F. Forbis, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after stating the foregoing facts, delivered the opinion of the court.

It is again contended on this appeal that the court below was in error in holding that Bender was entitled to redeem from the execution sale to King, and from the redemption made by O'Rourke. This part of the decree of the Circuit Court was before this court in King v. Bender, 116 Fed. 813, 54 C. C. A. 317, and the decree was there affirmed. This affirmance has become the law of the case, not only by the final judgment of this court, but by the decision of the Supreme Court of the United States, refusing to grant a writ of certiorari to review that judgment. 187 U. S. 643, 23 Sup. Ct. 843, 47 L. Ed. 346. This question is therefore not open to review on this appeal.

Whether the property awarded to Bender by the decree of the court below included personal property owned by the appellant, depends upon the question whether the articles in controversy, consisting of stage fixtures, appliances adapted to the stage, drop curtain, and chairs, had, by being annexed or affixed to the property, become accessory to and part and parcel of it. This is mainly a question of fact, depending upon the character of the articles, and the use and purpose for which they were placed in position; and, this fact having been determined by the court below, its finding will receive careful consideration, and will not be disturbed unless it clearly appears that the finding was not justified by the evidence.

The court found, in its opinion, that the building erected upon the land redeemed by Bender was erected, constructed, and used as an opera house from the very beginning, and that it was being used for that purpose at the time of the decree; that it was suitable for and adapted to such purpose, and could not well be used for other purposes without considerable changes and alterations in its interior arrangement and condition as it then stood and was being used; that it contained a stage and stage fixtures and appliances to facilitate the expeditious handling of scenery during theatrical perform-

ances; that it contained a large amount of theatrical scenery, a drop curtain, also a number of opera chairs and seats attached to the floor by means of screws and nails. The court also found that the scenery in controversy was attached to the stage only as needed, and was capable of being moved without injury to the stage and stage fixtures or to itself, and for the most part was lodged and stored in certain storerooms in the basement of the building. This scenery, together with the pianos in the building, and the loose, unattached chairs, were found not to be fixtures, and by the decree were awarded to the appellant, and are therefore not involved in this appeal. The court also found that Murray's claim to title to the articles in controversy was derived from his redemption from the decree entered in the proceedings instituted for the purpose of foreclosing the mechanics' liens upon the property; that this redemption was made for the purpose of protecting a small judgment which had been assigned to him. The court found further that there was a disclaimer of ownership of the chairs on the part of the Opera House Company, and a declaration by the company that Murray was the owner thereof, and that a resolution of the board of trustees or directors of the company allowed Murray a monthly rental for the chairs. But the court also found that this was all done at a time when Murray, by purchase or otherwise, had obtained control of a majority of the stock of the company; that he elected a majority of the trustees or directors of the company; that the trustees, acting at the time the resolution was adopted, were all of them in some way identified with Murray's interest, and subject to his control; that none of the minority stockholders of the corporation were present or represented in the transaction, and that their rights did not appear to have been considered or deemed worthy of consideration. The court found further that a lease of this property was executed by and in the name of the Opera House Company to one MacFarland; that this lease was executed by Murray, who was cognizant of the fact that the Opera House Company was being held out to MacFarland as the owner of the property; that Murray stood by and helped to clothe the Opera House Company with the apparent ownership and title of this property to a stranger to the title. The court also found that the opera house would have been incomplete as an opera house without chairs, and that those chairs, or similar chairs, were absolutely necessary in its use and occupation for theatrical performances, and that said chairs, affixed as they were, were a part of the building itself, and passed to King under his deed to the premises; that the stage and stage fixtures and drop curtain attached thereto were also fixtures.

The findings of the court are supported by the evidence. Upon the examination of Murray with regard to the agreement or understanding under which he was to be repaid for his expenditures, he testified that he was to be repaid from the net proceeds of the business of the building; that the account was carried on in the name of the Opera House Company; that he controlled the whole thing, and, when there was enough money on hand to pay him, he had it placed to his credit; that with respect to the property in controversy, after it was removed from the opera house building he had it hauled back,

and at that time there was no agreement or understanding between himself and the Opera House Company, or its officers, with reference to the future use of the property, but that afterwards he did have such an understanding; that, being the principal owner of the stock of the Opera House Company, he had the property put back to benefit himself, and to get back the money he had expended in the construction of the building; that without that or some other furniture the house would have been valueless; it could not have been run as a playhouse without furniture; that when he replaced the furniture in the opera house, he had no agreement with the managers of the Opera House Company until the first meeting of the new board in January, 1897, when he had a tacit understanding that he was to be paid after he got his money back; that prior to that time it was all under his own control, and there was nobody to consult; he managed the opera house, and owned the house and furniture.

Maguire, who was familiar with the transaction, testified that the agreement with Murray was that he should furnish the money and fix up the house again, and repay himself from the receipts; and, when that money was paid, the furniture was to be paid for at so much a month. But it appears from the evidence that it was not until June 28, 1899, that the board of trustees of the Opera House Company adopted a resolution declaring Murray the owner of the furniture, scenery, etc., and allowing him a rental therefor.

From this testimony it appears that Murray detached the furniture from the opera house as personal property, and afterwards, becoming the owner of the majority of the stock of the corporation owning the realty, he replaced the furniture in the opera house for his own benefit, and completed the building for the purpose for which it was to be devoted, but without any agreement with the corporation itself at that time that the furniture was to remain as personal property. There can be no doubt that, upon general principles of law, such an annexation of personal property is to be treated as of a permanent nature. New York Life Ins. Co. v. Allison, 107 Fed. 179, 182, 46 C. C. A. 229. In Ewell on Fixtures, p. 57, the law is stated as follows:

"It has been often held that a building or other annexation placed upon the land of another without his previous consent, and without any contract with him, express or implied, that it may remain the property of the builder as a personal chattel, becomes a part of the realty, and may not be removed by the party erecting it, or his vendee, as against the owner of the soil; and the doctrine holds as well with respect to joint owners as to strangers. One joint tenant or tenant in common cannot erect buildings or make improvements on the common property without the consent of the rest, and then claim to hold until reimbursed the proportion of the money expended."

This principle is clearly applicable by analogy to a case where the owner of a majority of the shares of stock of a corporation, for his own benefit and advantage as a stockholder, annexes personal chattels to real property owned by such corporation. The absence of a previous agreement in such a case that the property was to remain the personal chattel of the party making the annexation is evidence of a legal intention that the property was to be regarded as a fixture,

which must prevail over the secret intention that the property was to remain separate and removable.

The resolution of the trustees of the Opera House Company on June 28, 1899, declaring that the property belonged to Murray, and allowing him a rental therefor, cannot be considered as evidence of any great value in favor of Murray. That evidence shows that the trustees of the corporation were acting in the interest of Murray, who held a majority of the stock. The resolution was therefore nothing more, practically, than a declaration by his representatives in interest. Moreover, the adoption of the resolution was more than a year after title to the property had become vested in Bender, and more than two months after the commencement of this suit. It is therefore open to the suspicion that it was passed by the trustees for the purpose of supporting Murray's claim to title.

The court below found that Murray had received the rents, issues, and profits of the property from March 11, 1899, to February 1, 1900, with full knowledge and notice of Bender's rights in the premises, and by the decree Murray was required to make restitution thereof and pay the same, with legal interest. There is no question but that Murray received the rent of the premises from McFarland, the trustee, during the time mentioned, and, upon the evidence establishing this fact, the decree of September 4, 1901, was entered, and the matter referred to the master to state an account. Upon this reference evidence was offered for the purpose of showing that the rent so received by Murray was paid over to the Opera House Company. But, objection being made to the evidence, it was excluded by the master, and exception taken; but the exception was not brought to the attention of the court below, as provided by the rules of the court, and the final decree of March 20, 1902, was entered, following the decree of September 4, 1901, and adjudging Murray liable therefor. We are of opinion that, having determined that Bender's title to the property is valid, it follows, upon the record before the court, that he is entitled to the rents, issues, and profits derived therefrom, as determined by the decree of the court below.

The decree of the Circuit Court is therefore affirmed.