ERNEST G. MARTINDALE,

*vs.*

BOWERS BEACH CORPORATION, a corporation of the State of Delaware.

*Kent, Sept.* 20, 1922.

A referee's opinion, when approved by the Chancellor as a whole, possesses the force of a judicial precedent.

As between a vendee in possession under executory contract of sale and his vendor in whom the title still reposes, the same strict rule applicable between *mortgagor and mortgagee applies in determining whether chattels* have become a part of the realty.

The question whether a chattel has lost its movable character is a question of intention.

On the question of the precise intention of a party in putting a chattel on realty, statements made by him after the controversy has arisen are not to be accepted except against himself.

The actual intent accompanying one's act in erecting a building and electric lighting plant on real estate must be gathered, not from his present statements with respect thereto, but from all the facts and circumstances attending the transaction and manifest at the time.

Where an executory purchaser of pleasure resort site on which were a hotel building, dance hall, pool room, and other buildings erected a small building to house an electric light plant, and placed such plant therein for the purpose of lighting the other buildings, which was sufficient for that purpose, and which was the only means of lighting them provided, he must be deemed to have intended a permanent annexation to the realty, though such plant could have been removed and used elsewhere and was segregated from the main buildings.

In determining whether an electric light plant placed by an executory purchaser on real estate retaken by the vendor upon the purchaser's default is a part of the real estate, the court cannot be governed by the consideration that the vendor has been well compensated while creditors of the insolvent successor of the vendee will suffer great loss.

A receiver was appointed for the Bowers Beach Corporation under the insolvency statute of this state, and during the administration of its affairs, by order of the Chancellor, the receiver sold all of its assets, including a Delco lighting plant housed in a building erected specially for that purpose. The Bay View Amusement Company petitioned the Chancellor that the sale of the Delco lighting plant be not confirmed, to which an answer was filed on behalf of the receiver. The facts pertinent to the issues raised by the petition and answer are set forth in the following opinion of the Chancellor.

*James H. Hughes*, for the petitioner.

*Richard R. Kenney*, for the receiver.

THE CHANCELLOR. The petition of Bay View Amusement Company prays that a certain building and Delco lighting plant therein located be adjudged to be the property of the petitioner.

The building and lighting plant are located on a certain tract of land situate at Bowers Beach, on the Delaware Bay shore, the site of a pleasure resort. The land formerly belonged to certain individuals, predecessors in title to the petitioner. On it were located certain buildings and structures, the principal ones of which were a hotel building, a dance hall and pool room. The owners of the land entered into a written contract of sale thereof with Wilbur H. Durborough, who entered into possession, tore-down certain buildings and erected and altered others. He altered the dance hall and pool room and made additions thereto. At the same time he erected a small building for the purpose of housing a lighting plant. He purchased a Delco plant and placed it in this small building. The plant consists of a dynamo, batteries, etc., and is run by oil fuel.

It is with respect to the small building and lighting plant housed therein, together with its batteries and appliances, that the present controversy relates. The building is placed upon and

fastened to posts which are settled in the ground, and the Delco plant is attached and fastened to the floor of the building. The plant is attached by wires and connections with the dance hall and other places about the premises, and supplies light thereto. Though the petition and answer thereto raise an issue of fact concerning the adequacy of the plant to meet the lighting requirements of the premises, yet such is no longer an issue because of the admission, made by solicitors for both sides to the controversy at the hearing, that the plant is of sufficient capacity to do the work for which it was installed.

Having entered into the contract of sale with the owners of the real estate, Durborough transferred all his rights thereunder to Bowers Beach Corporation, a corporation. Durborough and his successor, Bowers Beach Corporation, defaulted in the performance of the conditions which the contract of sale imposed. The holder of the legal title thereupon, acting under the contract, declared the contract terminated, and entered into possession. The petitioning corporation was thereafter organized and conveyance of the title, as well as delivery of possession, duly made to it.

Bowers Beach Corporation was thereafter duly decreed to be insolvent by this court and a receiver therefor appointed. The receiver, in obedience to an order of the court, undertook to sell the assets of the corporation, and included therein the building and lighting plant above described, which he exposed to sale and struck off to the highest bidder, on the theory that the same were personal property belonging to the insolvent corporation. On the return of the sale, the pending petition was presented praying that the sale be not confirmed as to the Delco plant and its housing, on the ground that the same when erected and installed became a part of the real estate, title to which, as well as possession, was now in the petitioner, and never had been in the receiver.

The sole question, therefore, is whether the building and plant installed therein are to be regarded as chattels belonging to Bowers Beach Corporation at the time of the appointment of the receiver, or whether they are to be regarded, under the circumstances, as having lost their character of personal chattels and become merged in the realty as fixtures, title to which passed to the petitioner under the conveyance aforesaid.

The principles of law applicable to the general question of when a chattel ceases to retain its nature of personalty and to acquire the character of realty, have been heretofore considered in this state and are now fairly well settled. The difficulty presented in each case is not so much with the law that is to govern as with its application to the facts.

An opinion written by Hon. W. C. Spruance, acting as referee in an action pending in the Superior Court of this state, though not at the time of its rendition possessed with the force of a judicial precedent, may now, in view of the language of Chancellor Nicholson in *Equitable G. & T. Co., et al., v. Knowles, et al.,* 8 *Del. Ch.* 106, 123, 67 *Atl.* 961, be properly regarded as clothed with the sanction of a judicial utterance; for the Chancellor said that he "approved that opinion as a whole."

In that opinion, found published in the appendix of 8 *Del. Ch.* 539, Mr. Spruance gave expression to the following views which are sound in reason and well sustained by authority:

"The determination of questions as to what passes as real estate, or with real estate, depends largely upon the inquiry as to who are the claimants.

"While it is true as a general rule that he who fixes a chattel to the land of another, is in legal effect presumed to have given it to the owner of the land, yet there has always been a liberal indulgence to tenants for years in this regard, founded:

"First, upon the natural presumption that the tenant intended such annexation for his own profit and convenience, and not for the benefit of the landlord; and

"Second, upon considerations of public policy, the law favoring industry.

"And as the natural result of the further application of the last mentioned reason, a greater indulgence is given to a tenant who has erected trade fixtures, than to one who has erected fixtures for domestic convenience or even for agricultural purposes—it being recognized as sound policy to encourage manufacturers.

"As between the executor of the tenant for life, or in tail, and the remainderman, or reversioner, there has always been some indulgence to the former—but much less than is extended to the tenant for years as against the landlord.

"On the other hand the right of removal of fixtures by the executor of the tenant in fee simple has always been very limited. The law favors the inheritance, and presumes that it is not the intention of the owner of the land that it should go to his heir stripped of that which is nesessary to make its use convenient and profitable.

"These are elemental principles to be found in all the text-books, and clearly set forth in the leading case of *Elwes v. Mawe*, 3 *East*, 38.

"A mortgage is in fact a conditional conveyance of the property mortgaged, and the same rights and interest pass to the purchaser by judicial sale under the mortgage, as do directly to a grantee under an ordinary conveyance in which the same terms of description are used: and we therefore find that the rule applicable to fixtures is the same in both cases—that is to say, the strict rule, favoring the inheritance, which obtains between the heir and executor of the owner of the fee. 2 *Kent*, 346."

To these observations I would add that as between a vendee in possession under an executory contract of sale and his vendor in whom the title still reposes, the same rule is applicable as is applied between mortgagor and mortgagee—that is to say, the strict rule is applied which favors the inheritance as between the heir and the executor of the owner in fee. None of the indulgence which the law accords in favor of a tenant for life against the remainder-man, nor, *a fortiori* in favor of the tenant for years or at will against the landlord, is to be applied to one in possession under a contract of sale against his vendor. This is manifestly so from the nature of the relation which the parties bear to each other. A life tenant whose estate is limited cannot in reason be said to entertain the same intention towards the permanency of the improvements he makes, as one who by his contract of purchase has announced his settled purpose to become the owner of the fee. Much more is this so with respect to a tenant for years or at will. Such a person knows, as does his landlord, that his estate is but for a limited time and that the improvements he makes, so far as he is concerned, unless he can remove them, will in a definite time be a total loss to him. Hence it is, the law deals less strictly with him than with others in a different situation. His intentions are presumed to have some reasonable connection with his situation and accordingly, to an extent at least, are colored thereby. Not only so, but considerations having to do with personal convenience and the encouragement of industry, are allowed some weight in appraising the acts of a tenant who makes additions to another man's property.

But where a person is in possession who has engaged to become the absolute owner, and makes additions to the property, there is more reason to assume that his acts in so doing are prompt-

ed by a more permanent intent than would be so if the same acts were done by the tenant of a term. The law of course attributes to him a purpose to fulfill his contract and, therefore contemplat-ing himself as the ultimate owner in fee, his improvements are more readily regarded as looking to permanency.

The question of whether a chattel has lost its movable char-acter is a question of intention. (*Equitable G. & T. Co. v. Knowles, et al.*, 8 *Del. Ch.* 106, 67 *Atl.* 961; *Equitable G. & T. Co. v. Hukill, et al.*, 10 *Del. Ch.* 88, 85 *Atl.* 60), and being such the relation of the party to the realty to which claim is made that it belongs is one of the important things to be regarded in ascertaining that intention. For the reason above stated, the intention of Dur-borough in erecting the building and installing the Delco lighting plant therein, is to be construed with that same degree of favor towards the land as though he were a mortgagor and the petitioner his mortgagee. *Westgate v. Wixon*, 128 *Mass.* 304; *Hinkley & Egery Iron Co. v. Black*, 70 *Me.* 473, 35 *Am. Rep.* 346; *Lapham v. Norton*, 71 *Me.* 83; *Smith v. Moore*, 26 *Ill.* 392; *Ogden v. Stock*, 34 *Ill.* 523, 85 *Am. Dec.* 332; *Gunderson v. Kennedy*, 104 *Ill. App.* 117; *Moore v. Vallentine*, 77 *N. C.* 188; *Seatoff v. Anderson*, 28 *Wis.* 212; *Pomeroy v. Bell*, 118 *Cal.* 635, 50 *Pac.* 683.

Upon the question of what was the precise intention of the party in putting the chattel in its place on the realty, statements made by him after the controversy has arisen are not to be accepted except of course as against himself. In *Hopewell Mills v. Taunton Savings Bank*, 150 *Mass.* 519, 23 *N. E.* 327, 6 *L. R. A.* 249, 15 *Am. St. Rep.* 235, the following language, quoted with approval by Chancellor Nicholson in *Equitable G. & T. Co. v. Knowles, et al.*, *supra*, was used:

"The tendency of the modern cases is to make this a question of what was the intention with which the machine was put in place. *Turner v. Wentworth*, 119 *Mass.* 459; *Southbridge Savings Bank v. Exeter Machine Works*, 127 *Mass.* 542, 545; *Allen v. Mooney*, 130 *Mass.* 155; *Smith Paper Co. v. Servin*, 130 *Mass.* 511, 513; *Hubbell v. East Cambridge Bank*, 132 *Mass.* 447; *Maguire v. Park*, 140 *Mass.* 21; *McRea v. Central National Bank*, 66 *N. Y.* 489; *Hill v. National Bank*, 97 *U. S.* 450; *Ottumwa Woollen Mill v. Hawley*, 44 *Iowa*, 57. These cases seem to recognize the true principle on which the decisions should rest, only it should be noted that the intention to be sought is not the undis-closed purpose of the actor, but the intention implied and manifested by his act. It is an intention which settles, not merely his own rights, but the rights

of others who have or who may acquire interests in the property. They cannot know his secret purpose; and their rights depend, not upon that, but upon the inferences to be drawn from what is external and visible. In cases of this kind every fact and circumstance should be considered which tends to show what intention, in reference to the relation of the machine to the real estate, is properly imputable to him who put it in position."

In harmony with the view thus expressed, I discard from consideration that portion of the affidavit of Durborough filed as evidence against the petition, in which he states that the plant, when installed by him, was not intended as a permanent improvement. What was the actual intent which accompanied the act of Durborough in erecting the building and housing therein the Delco plant must, therefore, be gathered not from his present statements with respect thereto, but from all the facts and circumstances attending the transaction and manifest at the time. In *Bank v. North*, 160 *Pa.* 303, 28 *Atl.* 694, the court said:

"I can find no case in which the declaration of him who placed the articles where they were, that he thereby intended, secretly within himself, to make them part of the realty, has been given any controlling effect."

The receiver, on his brief, quotes the following from *Ewell on Fixtures*, 21, 22:

"That the true criterion of an irremovable fixture consists in the united application of several tests:

"First, a real or constructive annexation of the article in question to the realty; and

"Second, appropriation or adaptation to the use or purpose of that part of the realty with which it is connected;

"Third, the intention of the party making the connection to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation and the policy of the law in relation thereto, the structure and mode of the annexation and the purpose or use for which the annexation has been made."

Testing the case now before me by these criteria it appears that the Delco plant and its housing were actually annexed to the land, and, secondly, they were appropriated and adapted to the use or purpose for which the realty was intended to be employed. These two features are clearly present. But as to the third, it is

insisted that there was no intention that the annexation and appropriation should be permanent. Considering all the attending facts and circumstances, and keeping in mind the strict point of view which Durborough's relation to the land of vendee in possession imposes, I am constrained to disagree with this contention. The buildings, if they were to render the service for which they were designed, necessarily had to be well lighted; the plant was adapted to supply the requisite quantity of light; the premises to which it supplied light were designed for amusement and entertainment purposes, purposes which clearly could not be effectively served unless a plentiful supply of light were afforded; and no means of regularly lighting the premises were, so far as appears, attempted to be provided, except from the plant in question. While it might be urged that the structure was not of a substantial nature, yet it appears to have been substantial enough. The facts as presented do not warrant the surmise that a new plant was intended to be installed in place of this one. The most that the facts would seem to suggest in this connection is that perhaps in the future the plant might be improved by slight alterations.

The fact that the plant was not specially designed for or adapted to use on the Bowers Beach premises, but could be used elsewhere, cannot be said to be conclusive on the question of whether its character is now that of personalty or realty. *Atlantic Safe Deposit Co. v. Atlantic City Laundry Co.*, 64 *N. J. Eq.* 140, 53 *Atl.* 212. If this were not so, then many articles which the authorities would uniformly concede to be fixtures would cease to be such.

Nor can the fact that the lighting plant was segregated from the main buildings be accorded any significance in determining its character. It was in a building erected on and settled in the land. This was, no doubt, due to considerations of safety and convenience. In this particular the case is to be treated as though all the buildings were in one, with a basement underneath and the plant located therein.

While the earlier cases attach more importance to the fact of annexation to the realty as a factor in ascribing the nature of real property to a movable chattel than do the later ones, yet the necessity of finding annexation to exist in some form, either ac-

tually or constructively, still exists. In the pending case, however, there can be no controversy over this feature. The only question that can arise is whether there are facts whose presence overcome the presumption which, under the circumstances, flows from the annexation to the realty and which, in spite of such annexation, disclose the purpose to have been a temporary one. I can find no such facts in the case. In *Equitable G. & T. Co. v. Knowles, et al., supra,* a dynamo was held to be removable from the premises because not a part of the realty. But this is of no value as a precedent, because the facts were said to show an intention that the dynamo should not lose its chattel character. What those facts were is not disclosed by the report. And, furthermore, the Chancellor stated that it was *admitted* to be personal property. There, therefore, seems to have been no controversy concerning it.

Two cases—*Towne v. Fiske,* 127 *Mass.* 125, 34 *Am. Rep.* 353, and *Rahway Saving Institution v. Irving Street Baptist Church,* 36 *N. J. Eq.* 61—are cited by the receiver as analogous to the pending case and as hostile to the contention of the petitioner. Those were cases involving portable iron furnaces. They seem to base their results on the view that the furnaces were not attached to the realty. Those cases seem to me to approach the extreme. At all events, they are distinguishable from the instant case in that here the building and lighting plant were actually affixed to the realty. It may be observed in passing that in *Gunderson v. Kennedy,* 104 *Ill. App.* 117, and in *Stockwell v. Campbell,* 39 *Conn.* 362, 12 *Am. Rep.* 393, under a state of facts somewhat similar to those found in the Massachusetts and New Jersey cases, a conclusion different from that arrived at in those two jurisdictions was reached.

Another case cited by the receiver is *New York Life Insurance Co. v. Allison,* 107 *Fed.* 179, 46 *C. C. A.* 229, which was in the Southern District of New York. That case involved the question of engines and dynamos for supplying electricity for lighting and ventilating a theatre. Electricity had formerly been obtained from a public utility company. The court, in holding the articles in question to be personalty, set forth the controlling facts on which its conclusion rested, as follows:

"The circumstances that the building was prepared to be lighted with gas that its electric lighting system was prepared for connection with the street

supply, and that the dynamos and engines were introduced into the building upon considerations of temporary economy, and not of necessity, are quite controlling.

In the instant case, no facts such as these appear. The dance hall, etc, had no provision for illumination other than by electricity; there was no supply of electricity to be had from any source other than the plant in question; and no considerations of temporary economy are disclosed. To all appearances, if the lighting plant were removed from the premises the same would be rendered useless for the purposes intended.

In the case just referred to, the federal court sought to apply to the facts the law of fixtures as the same was found to exist in the New York State courts. This circumstance gives to the case of *Berliner v. Piqua Club Ass'n.*, 32 *Misc. Rep.* 470, 66 *N. Y. Supp.* 791 (*affirmed* 73 *App. Div.* 662, 76 *N. Y. Supp.* 671) a special interest, aside from its own intrinsic value, as supplementary to the case of *New York Life Insurance Co. v. Allison, supra,* appearing in the federal courts of that state. In the *Piqua Club Case* the controversy was with respect to engines and dynamos used for generating electric current for the purposes of a club. The chattels in question were not located on the club premises. They were installed outside, in a vault excavated under the sidewalk. The court said:

"The courts have advanced in the last half century from the inspection as to how firmly articles have been attached to the realty, in the ascertainment as to whether they pass with it by conveyances, to the more important consideration of union in usefullness for the purposes of the structure and permanence of association."

And, accordingly, it was held in that case that the engines and dynamos belonged to the real estate as fixtures.

The case of *Vail v. Weaver*, 132 *Pa.* 363, 19 *Atl.* 138, 19 *Am. St. Rep.* 598, cited by the receiver, simply holds that the question of the intent with which certain lighting machinery was installed was for the jury to pass upon in the trial of that particular case. No question of that kind is, of course, involved in this case. If the case were at all pertinent, its facts render it very clearly distinguishable.

The receiver cites another Pennsylvania case, *Bank v. North*, 160 *Pa.* 303, 28 *Atl.* 694, in opposition to the petition. That case holds that steam radiators for heating a dwelling are to be regarded as similar to gas stoves or gas fixtures, and are, therefore, removable. It is argued that a lighting plant, such as that which appears in this case, ought to be regarded as in the same category with gas fixtures and steam radiators, and, if so, the Pennsylvania case is an authority against the petitioner. I cannot accept this reasoning. A generating plant in an electric lighting system is not similar to gas fixtures nor to steam radiators. Its analogue in the one is the central plant where the gas is manufactured, and in the other, the boiler where the steam is fired, not in the fixtures where the gas is emitted, nor in the radiators where the steam circulates. In the Pennsylvania case the steam for heating was not obtained from a boiler on the premises. It was received from a public utility company which supplied steam for heating purposes from a central plant, as gas is supplied to the consuming public. And it is to be observed that all that part of the heating system, other than radiators and their valves, consisting in large part of service pipes suspended from the cellar wall, regulator trap and other pipes called risers, all of which could be conveniently removed without injury to the building, were held to be a part of the realty and not removable. I find nothing in the case which supports the contention for which it is cited.

I have examined all the authorities cited by the receiver on his brief, and do not find it necessary to comment on any of them, other than those above referred to.

Though the law dealing with subjects of the kind now before me for consideration is at this time fairly uniform in all justidictions, yet its application to facts is often troublesome. The facts in cases that arise are so varied that adjudicated cases are frequently of little value as precedents. Generally speaking, each case must stand alone. Taking into consideration all of the facts in this case, the manner of the construction of the building and of the installation of this plant, the purpose it was to serve, the nature of the premises, the relation of Durborough and the insolvent corporation to the title, I am constrained to hold that the plant and its housing belong to the real estate. I confess to a wish that

I might hold otherwise, for it would appear that the owner of the land has already been exceedingly well compensated in cash and other benefits, while creditors of the insolvent corporation are in a fair way of suffering great loss. But I cannot, of course, be governed by this consideration.

An order will, therefore, be entered refusing confirmation of the sale of the Delco lighting plant and its housing, and adjudging the same to be the property of the petitioner as owner of the real estate, and directing the receiver to return to the successful bidder the percentage money paid on account of his bid.