SENARA WARRINGTON, Administratrix of Mary J. Warring-ton, Deceased, d. b. a., v. LIDA HIGNUTT and CHARLES E. HIGNUTT, p. b. r.

(*April* 7, 1943.)

LAYTON, C. J., sitting.

*Howard W. Bramhall* for the plaintiffs.

*James M. Tunnell, Jr.,* for the defendant.

Superior Court for Sussex County, February Term, 1943.

LAYTON, Chief Justice:

This is an appeal from a judgment rendered by a Justice of the Peace in an action of replevin.

The facts are these: in February, 1917, Levi J. Warrington died testate, devising all of his residuary estate to his widow, Mary J. Warrington, for life, and thereafter to his children. A part of the residuary estate so devised was a lot of land on High Street in Seaford, Delaware, improved with a frame dwelling house. Some time after the death of her husband the life tenant devoted the house to use as a two apartment house, and such use was continued to the time of her death. It does not appear how the building was heated in the first years of its use as an apartment house; but there was no evidence that it had ever been equipped with a central heating plant, and it may be assumed that it was heated by stoves burning coal or wood as fuel. In 1936, the life tenant bought and installed in one of the apartments a stove or heater, known as an Estate Heatrola, using oil as fuel; and in 1939, she bought and installed a like stove in the other apartment. It is contended that the life tenant bought these stoves with money belonging to the estate of her deceased husband, but the evidence clearly showed that the money was her own. These stoves were placed on the floors of the apartments, as are ordinary stoves, and were connected to the chimney by the usual stove pipes. Copper piping connected to the stoves was led through small holes bored through the floors to oil supply tanks of 100 gallons capacity placed on supports outside the building. The copper piping was attached to the building by small metal clamps. In the ceilings of the rooms in which the stoves were placed were registers through which heat was conducted to the upper floors of the apartments.

Mary J. Warrington, the life tenant, died on January 20, 1940. No administration of her estate was had until July 20, 1942, when letters of administration were granted to the defendant, Senara Warrington, a daughter.

In 1942, proceedings to partition the real estate of Levi J. Warrington, deceased, were instituted in the Orphans

Court, and on June 20 of that year the lot of land with the improvements was sold to Lida Hignutt, a daughter of the deceased, and Charles E. Hignutt, her husband. The sale was confirmed by the court on July 11, 1942, and the property was conveyed to the purchasers by the trustee appointed to effect the sale by deed dated July 15, 1942.

At the time of the sale the stoves remained in the building and as they were attached thereto. Thereafter, they were removed and sold by the defendant administratrix on the theory that they were personal assets of the deceased life tenant, and not fixtures.

The purchasers of the real estate sued the defendant administratrix in replevin before a Justice of the Peace to recover possession of the two Estate Heatrolas and a gas stove which had been in one of the apartments, and judgment by default was rendered in their favor. The defendant appealed to this court, where a jury trial was waived; and it was agreed that, under the evidence, the right of possession of the gas stove was not for decision as it belonged to a tenant of one of the apartments.

 A fixture is an article which, though originally a chattel, is, by reason of its annexation, regarded as a part of the land, partaking of the character of realty and, ordinarily, belonging to the owner of the land. The rule of the common law is that whatever is once annexed to the freehold becomes a part of it, and cannot be removed except by him who is entitled to the inheritance. The rule as far back as can be traced was never inflexible and without exceptions, and was variously applied strictly or less so as the relationship of the parties was found to be. The cases disclose little uniformity as to the tests to be applied in determining whether or not a chattel used in connection with land is to be considered a fixture. At common law the mode of annexation, whether slight and temporary, or firm and permanent, was the criterion. By other authorities the adap-

tation of the article to the use or purpose to which the real estate was appropriated, however slight its physical connection with it, was held to be the true test; and other courts expressed the opinion that actual annexation and adaptation to purpose must unite in order to render chattels incident and appurtenant to real estate. The great weight of authority today regards the intention of the party making the annexation, as disclosed by the surrounding circumstances, the controlling test. It requires some positive act on the part of the annexor to change the nature and legal qualities of a chattel into those of a fixture, and it is reasonable to hold that the intention to make the article a permanent accession to the realty must plainly appear. The test of intention as discoverable in the facts and circumstances of the particular case is one of general and uniform application by which, in most instances, the essential qualities of a fixture can be determined, and by which the apparent conflict in the authorities may be reconciled. Under this doctrine, the nature of the chattel, the mode of its annexation, the purpose or use for which the annexation has been made, and the relationship of the annexor to the property are considered and weighed in determining the question of intention. The mode of annexation may have little or no significance; but where the chattel has been so affixed that it cannot be removed without serious damage to the realty or to the chattel itself, the mode of annexation alone may, as a matter of law, be conclusive of the annexor's intention. The character of the article as adapted to the use of the realty and the appropriation of the article to that use may be considerations of weight in disclosing the annexor's intention; but it may we'l be that the article itself may be removed and as well utilized elsewhere, and, in such case, the intention is but dimly revealed. Again, the relationship of the annexor to the land is a factor. Having regard for the probabilities it is reasonable to suppose that the owner of the fee regards an improvement placed on the land by him as one for the general

betterment of the estate, and, therefore, is intended as an accession to the land; while, on the other hand, if the annexor is not the owner of the fee, the reasonable probability is that the improvement was placed there for his personal convenience and for the limited term of his estate, thereby negativing an intention to make the improvement a permanent accession. In each case the intention of the annexor is presumed to have some reasonable connection with the situation as it existed when the improvement was made, and, to an extent at least, is discoverable thereby. And so the authorities hold generally that as between the executor and heir the strict rule of the common law is applied in favor of the latter, and likewise in favor of the vendee or mortgagee as against the vendor or mortgagor. As between the landlord and tenant, the greatest latitude is al owed in favor of the tenant; as between tenant for life, or in tail, and the remainderman or reversioner, the general statement to be found in the authorities is that the strict rule of the common law is somewhat relaxed. In other words, the tenant for life seems to hold a middle ground. He enjoys some favor, more, for example, than is accorded to the executor as against the heir, but less, as it seems, than is accorded to a tenant as against the landlord. Why this is so is not clear; and from the language in some of the cases no distinction seems to be made. In *Whiting v. Brastow*, 4 Pick. (Mass.) 310, it was said, "There seems to be no doubt that * * * a tenant for life, years, or for will, may at the expiration of his estate remove from the freehold all such improvements as were erected or placed there by him, the removal of which will not injure the premises or put them in a worse plight than they were in when he took possession." In *Teaff v. Hewitt*, 1 Ohio St. 511, 59 Am. Dec. 634, the question is asked, "Why is a tenant for life or for years or at will, favored with the right of removing articles which he attaches to the land during his term?" And after quoting the above language in *Whiting v. Brastow*, the court proceeds to say, "All that is

required of a tenant, is to leave the land in as good condition as it was when he received it." In Beattie v. Hulse, [1905] 1 Ch. 406, 2 Ann. Cas. 404, Buckley, J., after stating that the strict common law rule was relaxed as between tenant and landlord for the benefit of trade, continued, "It was advantageous that the tenant should be at liberty, for the purposes of his trade, to affix chattels to the soil, and in his case there was established an exception by which he was entitled to remove the fixtures during the term. As between tenant for life and remainderman the same principle is applicable. It is advantageous that the tenant for life should be in such a position as to be able to improve the estate for his own enjoyment without being thereby compelled to make a present to the remainderman. The remainderman is not injured if the person deriving title under the tenant for life removes the fixtures, leaving the remainderman with the freehold in the same state as it would have been if the chattels had never been affixed. Lord Hardwicke in 1751 in Dudley v. Warde, (1751) Ambl. 113, 114, said: 'The case being between executor of tenant for life in tail, and remainderman is not quite so strong as between landlord and tenant. Yet the same reason governs it.' Speaking of the two cases of tenant and landlord and tenant for life and remainderman, Rigby, L. J., in Ward v. Taylor, [1901] 1 Ch. 523, 530, goes a little beyond this sentence in saying that 'the exception extends equally, as is shown by Dudley v. Warde, Ambl. 113, 114, to the case of a tenant for life, and the person who comes into possession of the estate upon his death.' In Fisher v. Dixon, 12 Cl. & F. 312, 328, 69 Rev. Rep. 97, Lord Cottenham puts the case of tenant and landlord and that of tenant for life and remainderman together in a separate class, distinguishing them from that of executor and heir." See, also, 22 Am. Jur. 725. In this State it has been recognized indirectly at least that some indulgence is shown to the tenant for life as against the remainderman. Equitable G. & T. Co. v. Knowles et al., 8 Del. Ch. 106, 67 A.

961 (see appendix for opinion of referee) ; *Martindale v. Bowers Beach Corp.*, 13 *Del. Ch.* 288, 118 A. 299 ; and where a tenant for life has made improvements for the purpose of making the property more beneficial to him, there seems to be no reason why such tenant should not occupy as against the remainderman the same favorable position in law as does a tenant against the landlord.

█ In the instant case the life tenant was the residuary devisee under the will of her husband. It may be supposed that, by devoting the building to use as an apartment house, the income therefrom was increased. There is no reason why a life tenant of a building may not seek to derive the utmost benefit from it. In some sense the use is a trade or business; and it is not unusual. The chattels now claimed to be fixtures were but stoves using oil as a fuel instead of wood or coal. They were ordinary articles of commerce not specially designed for use in the particular building. The type of stove required outside fuel tanks, making necessary the use of small supply pipes leading from the tanks through holes bored through the floors to the stoves. These pipes, for their support, were fastened to the building by small clamps. Practically speaking, the stoves were as easily and readily removable as ordinary stoves, and with no resulting damage to the building except the two small holes left in the floors. It is true that the stoves were adapted and appropriated to the use and purpose of the building, but no more so than the usual coal stove; and they were likewise adaptable to use in any building having a chimney. The evidence does not disclose when the registers were placed in the ceilings. For all that appears they were there when the oil stoves were installed. It is difficult, therefore, to infer an intention to make the stoves permanent accessions to the building either from the mode of annexation for it was but slight, or from their adaptation to the use and purpose of the building, for they were usable in almost any building, or from the relationship of the annexor to the realty, for

some indulgence, at least, is accorded to the tenant for life. In all of the circumstances there is not to be found a certain intention on the part of the life tenant to make a present of the stoves to the inheritance; and if the matter of intention be left in doubt, the legal qualities of the articles are not changed; they remain chattels. *Teaff v. Hewitt, supra.* It seems hardly necessary to cite authorities holding that portable stoves removable without injury to the freehold are personal property; and that too in the case of mortgagor and mortgagee. *Harmony Building Association v. Berger,* 99 Pa. 320; note to *Young et al. v. Hatch,* 99 Me. 465, 59 A. 950, 2 Ann. Cas. 374.

It is contended that the right to remove the stoves was lost because they were allowed to remain in the building for an unreasonable length of time after the expiration of the life tenancy; and it is said that, unexplained, nonaction on the part of the administratrix and the heirs at law of the life tenant for over two years raises the presumption that it was the intention of all of the interested parties that the stoves should continue to go with the real estate. The rule of law contended for has no application. If the theory of a presumption of abandonment is relied on, the answer is that the stoves never had become fixtures. See *Rey v. Young,* 160 Iowa 613, 142 N. W. 393, 46 L. R. A. (N. S.) 947, Ann. Cas. 1915D, 258. If what is meant is that the purchasers of the real estate had been led to believe that the stoves were permanent accessories to the building, there is no evidence of an estoppel by conduct which would preclude the administratrix from asserting the rights of the estate. One of the plaintiffs, Mrs. Hignutt, is a daughter of the deceased life tenant; and, as one entitled to share in the residue of the personal estate of the deceased, she was entitled to apply for the issuance to herself of letters of administration. 3808, Rev. Code. It may be assumed that administration of the estate was postponed by the express or tacit agreement of the heirs at law. All of them are re-

sponsible for the delay; and the plaintiff, having as an heir at law acquiesced in allowing the stoves belonging to her mother's estate to remain in the building as much for her own benefit as for the other heirs at law, she cannot now insist that the right of the administratrix to remove the stoves had been abandoned. When the defendant was empowered to act for the estate in her capacity as administratrix, there was no delay at all. The fact is that the removal of the stoves was practically coincidental with the grant of letters of administration.

Judgment for the defendant.