Samuel V. ABRAMO, Trustee Under the Will of David Ploener, deceased, and Lillian Ploener, Plaintiffs,

v.

Arthur PLOENER, South Wilmington Leasing Company, a corporation of the State of Delaware, and Auto Disposers, Inc., a corporation of the State of Delaware, Defendants.

Superior Court of Delaware, New Castle County.

Submitted Feb. 17, 1978.

Decided Sept. 29, 1978.

Louis J. Finger, of Richards, Layton & Finger, Wilmington, for plaintiffs.

Clifford B. Hearn, of Balick & Hearn, Wilmington, for defendants.

TAYLOR, Judge.

Plaintiffs seek to recover damages resulting from the condition in which land was vacated which was occupied for many years by one or more of the defendants, located on Garasches Lane near the southerly border of the City of Wilmington. Prior to the death of David Ploener in 1960, this land was owned as tenants in common by David Ploener and plaintiff Lillian Ploener. The will of David Ploener devised his interest in the land to a trust in which Lillian Ploener was life beneficiary and the four Ploener children were remainder beneficiaries. Since that time the trust has been administered by a succession of trustees who have administered this land with Mrs. Ploener's consent. Arthur Ploener [defendant] is one of the sons of David Ploener. The corporate defendants are owned in whole or in part by Arthur Ploener and he is their principal officer.

I.

A review of the occupancy of this land is appropriate.[1] In August, 1962, the middle portion of parcel number one of this land was rented to Tony Domino for junking automobiles. Later in 1962 the remainder of parcel number one was leased either to defendant and to his brother Burton Ploener or to their corporation, Ploener Auto Parts Company, Inc. Shortly thereafter, that corporation became insolvent and Burton Ploener withdrew from the venture. Thereafter, defendant occupied the land for a number of years using various non-corporate names, sometimes in partnership and sometimes as a sole venture. In 1965 defendant formed South Wilmington Leasing Company, Inc. and conducted a business operation on parcel number one, and this relationship appears to have existed throughout the remainder of the occupancy of parcel number one. In 1969 defendant leased parcel number two of the land and conducted a business operation there through Auto Disposers, Inc. and this relationship appears to have continued at all subsequent times at issue here. All leases

---

1. The property will be referred to as land, although part of it is under water and for the most part it is marshy.

involving Arthur Ploener or the corporate defendants have been oral.

■ Defendant contends that he has no personal liability because during the period from 1965 through June 30, 1975 the land was leased by two corporations, namely, South Wilmington Leasing Company, Inc. and Auto Disposers, Inc., and not by him personally. In support of this position defendant relies on the fact that the operations on the land were conducted in the corporate names and that the checks by which the rent payments were made were drawn on corporate bank accounts. Separate rent checks were paid covering parcel numbers one and two. It does not appear that either party signified to the other its intention or understanding with respect to a change of the lessee from defendant. It appears that throughout the lease period, the successive trustees in their accounts listed the lessee as A. Ploener or Arthur Ploener.

In November, 1974 defendant filed a pleading in the Court of Chancery which opposed appointment of plaintiff as trustee in which defendant stated:

"Currently Arthur Ploener is leasing the [land involved here] on an oral lease as he has for some thirteen (13) years and is conducting a junk yard and automobile storage business known as South Wilmington Leasing Co., Inc."

Beginning in the summer of 1973 and continuing until shortly before their relationship ended on June 30, 1975, the parties engaged in protracted negotiations for a long-term lease of this property to defendant at substantially increased and escalating rental. It appears that these negotiations contemplated that defendant would be the lessee, with the exception of a draft submitted by defendant's attorney which changed the tenant from individual to corporation. Negotiations reached an impasse and on February 20, 1975 plaintiff wrote to defendant formally terminating the lease as of May 1, 1975. On May 1, 1975, defendant's attorney wrote to plaintiffs notifying that defendant terminated the lease effective July 1, 1975.

From this review, it is clear that at least at an early stage, defendant was the lessee. At the later stage of the relationship, during negotiations and at termination, the parties treated defendant as the lessee. If defendant undertook to substitute his two corporations for himself as tenant, it was at most done by indirection merely by drawing the rent on corporate accounts and it was done without express notification to the landlord that the corporations were being substituted in place of defendant as the lessee.

No authority has been cited to support the proposition that a substitution of tenants can be done in such a surreptitious manner thereby relieving the original tenant of further liability as lessee. In my judgment, this unilateral action neither created a meeting of the minds nor an estoppel which would protect defendant from further liability under the tenancy. *Taylor v. Conforti*, Del.Super., 361 C.A. 1975 (Letter Opinion, September 15, 1975, Taylor, J.), aff'd, Del.Supr., 372 A.2d 538 (1977). There is nothing indicating that the owner ever accepted the substitution of the corporations for defendant as tenant. In order to effect that result, there must be an announced withdrawal by the original tenant and a proffered substitution by the proposed successors and an acceptance by word or action by the landlord. Ibid. See as to sublessee *Amco Trust, Inc. v. Naylor*, 159 Tex. 146, 317 S.W.2d 47, 73 A.L.R.2d 1109; 81 A.L.R.2d 793, *Abbott v. Bob's U-Drive*, 222 Or. 147, 352 P.2d 598, 74 A.L.R.2d 1, *Peiser v. Mettler*, 50 Cal.2d 594, 328 P.2d 953. The evidence does not meet this test. Consequently, if the tenant's obligations were breached by leaving the property in improper condition, defendant must be held liable therefor.

## II. A.

■ The next issue is what responsibility defendants had with respect to the condi-

tion in which the land was left. Plaintiffs rely upon two theories of recovery, namely, implied contract and tort.[2] Defendants' response is that this tenancy was covered by the Landlord-Tenant Code, 25 Del.C. Chapters 51 through 67 and a basis for liability must be found in that Code.

25 Del.C. § 5103 provides:

"This code shall regulate and determine all legal rights, remedies, and obligations of the parties and beneficiaries of any rental agreement of a rental unit within this State, wherever executed."

Rental unit is defined in § 5102(9) as "a term which encompasses dwelling, commercial and farm units." It is clear that this property is not a dwelling unit or a farm unit.[3] If the land is to be covered by the Code it must qualify as a "commercial unit," which is defined as "a structure or that part of a structure which is used for purposes other than a dwelling unit or farm unit." 25 Del.C. § 5102(1). While this definition is extremely broad with respect to structures, it does not appear to encompass land which is not being used in connection with a structure. Here, the land as leased was bare and there is no indication that any structure existed on it during the tenancy. Hence, I conclude that this land was not covered by the Landlord-Tenant Code. Accordingly, plaintiffs are not barred by that Code from asserting whatever claims they have based upon implied contract or trespass.

### B.

In general, the law holds that where the contract does not show a contrary intent a tenant must leave the premises in essentially the same condition in which he received it. 51C C.J.S. Landlord & Tenant § 408, pp. 1050–1; 49 Am.Jur.2d Landlord & Tenant §§ 939–40, pp. 913–5.[4] Cf. *Warrington v. Hignutt*, Del.Super., 31 A.2d 480 (1943). The bulk of defendants' cited cases deal with leased buildings, where the specific issue was whether the condition of the building at the conclusion of the lease rendered tenant liable. Ibid.

Here, the oral contract did not touch upon the subject of how the premises should be left. This was bare land partly submerged and generally low, marshy land. It was to be used for defendants' business which was the disassembling of automobiles and dealing in scrap materials. This might involve the deposit of unwanted portions into the low land and it is clear that any raising of the land above water level which would render the land more useable was a reasonable result to the landlord.

Defendants contend that to require them to remove the tires and debris at the end of the lease would be as unreasonable as it would be to require a tenant to fill a gravel pit at the end of a lease. The distinction is that if a lease extended to the tenant the right to remove dirt from the land no duty to refill would be implied. However, here the tenancy was not for the purpose of conducting a dump, where permanent addition of material was contemplated. The operation of tenant was in general a salvage operation in which the storage on the land was of limited duration, since the object of the operation was to sell the salvaged materials.

Few cases have considered the application to bare land of the general rule stated

---

**2.** In view of the conclusions reached herein it is not necessary to discuss the distinguishing characteristics between these two theories of recovery.

**3.** " 'Dwelling unit' is a structure or that part of a structure which is used as a home, residence or sleeping place by 1 person or by 2 or more persons maintaining a common household to the exclusion of all others." 25 Del.C. § 5102(2).

" 'Farm unit' is a rental unit used by a tenant for agricultural purposes to maintain a livelihood." 25 Del.C. § 5102(3).

**4.** *United States v. Clark*, 94 U.S. 73, 24 L.Ed. 67 (1876) states that the tenant's obligation rests upon the maxim "Sic utere tuo ut alienum non laedas," and if he fails in this "he must respond accordingly"!

above. *Northcraft v. Blumauer*, Wash. Supr., 53 Wash. 243, 101 P. 871 (1909) held that upon expiration of lease tenant must remove gravel placed on land by tenant for a roadway. *United States v. Jordan*, 6 Cir., 186 F.2d 803 (1951) held the tenant liable for damage to timber which was penetrated by bullets during military maneuvers by tenant.

It is recognized that some cases hold that in the absence of a requirement in the lease a tenant need not remove improvements, alterations or fixtures added by the tenant with consent of the owner. *Arkansas Fuel Oil Co. v. Connellee*, Tex.Civ.App., 39 S.W.2d 99 (1931); *Lamonica v. Bosenberg*, N.M.Supr., 73 N.M. 452, 389 P.2d 216 (1964); *McKenzie v. Western Greenbrier Bank*, W.Va.Supr., 146 W.Va. 971, 124 S.E.2d 234 (1962); *Duvanel v. Sinclair Refining Company*, Kan.Supr., 170 Kan. 483, 227 P.2d 88 (1951); see annotation 23 A.L.R.2d 655.

There is no doubt that the parties contemplated that defendants would use the land for the purpose for which they used it. However, I cannot accept the proposition that it was contemplated that items such as piles of tires, junked buses and other items which interfered with use or development of the land would remain on the land after tenants' use ceased.

I conclude that to the extent that items which remained on the land after defendants withdrew interfered with the normal use of the land defendants are liable for their removal.

### C.

Plaintiffs also claim damages for defendants' removal and partial destruction of a fence which defendants had erected. Defendants contend that plaintiffs are not entitled to recover for removal of the fence because defendants had no duty to leave the fence. For support, defendants rely on *Warrington v. Hignutt*, supra, which held that a landlord could not require tenant to leave oil stoves which tenant had provided and used in the leased building. *Warrington* was cited with general approval by the Delaware Supreme Court in *Della Corporation v. Diamond*, Del.Supr., 210 A.2d 847 (1965). *Diamond* pointed out that a prime consideration is the intention of the party at the time he made the annexation to the land and that a further consideration is whether removal would do serious damage to the realty or to the item which had been annexed to the land.

The item involved here is a fence whose upright supports were set in concrete which had been poured in holes in the ground. The fence could be removed from the land without serious damage to the land. However, it appeared to be a permanent fence barrier for this area, and the use of concrete for holding the posts is indicative of an intent not to remove the fence. Moreover, defendants did not take much of the fence for use elsewhere after removing it. They dislodged the fence with a bulldozer and left posts and some fence in mangled condition on the premises.

I conclude that defendants were not entitled to remove the fence upon vacating the premises and that they are liable for not permitting it to remain in place.

### III.

The next issue is the amount which plaintiffs are entitled to recover as damages. Shortly after defendants vacated the premises leaving a large quantity of tires and debris behind, a fire broke out on the premises. Following the fire, plaintiffs were directed by law enforcement authorities to clean up the site within a specified short time or face criminal prosecution which could result in fine of $500 per day. Defendants aided in eliminating the fire, but they refused to have any part in the removal of the tires and debris, as plaintiffs had been ordered to do.

A great quantity of material had to be removed. According to the testimony there

were a number of piles of materials and debris ten to fifteen feet high. Because the County landfill required tires to be separated from other materials and because tires were mixed with the other things on the lot it was necessary to sort the tires out. This added substantially to the removal time and cost. It was estimated that twelve tons of tires alone were removed. Because of the limited time afforded to plaintiffs to accomplish this work, and because of the agglomerate nature of the mass of debris, it was necessary for plaintiffs to contract with a remover on a per load and hourly basis. At some point during the clean up work the contractor changed the method of charging. However, a location where the material could be dumped without charge became available, thus eliminating further landfill charges. It has not been shown that the charges were unreasonable or were not justified in view of the work done. Therefore, I accept the bills as being reasonable for the work done.

Defendants contend that plaintiffs removed material which need not have been removed in view of the nature of the land. If this is true, defendants have not shown what material was not required to be removed and what saving could have been effected by not removing it. In the absence of such showing the Court will accept the actual removal expenditures as reasonable.

Defendants state that they started to move May 1, 1975 and that they sold and removed much material. Their contention is that they suffered substantial loss because they had to move. This is the product of a month-to-month rental arrangement and a firm line taken by plaintiffs as to future lease arrangements. However, the issue here is the expense of removal of items from the land, and it does not appear that plaintiffs refused to permit defendants to come on the land for the purpose of removing the items after the lease expired. In fact, it appears that defendants refused to share any part in the removal after the lease expired. Therefore, I do not find any factor which should lessen defendants' liability for removing what was left on the premises.

Defendants contend that since portions of the land had been previously occupied by others prior to defendants' occupancy, it has not been shown that the debris was defendants'. In view of the duration of defendants' occupancy I do not find plaintiffs had the burden of allocating debris between defendants and their predecessors. I feel that plaintiffs have made a sufficient showing that the debris existing at the conclusion of their occupancy was attributable to defendants.

Defendants next contend that after the fire, plaintiffs could have erected a fence around the property and could have obtained a permit which would have authorized plaintiffs to merely cover the debris without moving it. The likelihood of obtaining such a permit and the cost of complying with the conditions of the permit have not been covered by acceptable evidence in the case. Nor has it been shown that the land with the debris covered with dirt would have had as much usefulness and value as it does in the cleared condition. Defendants' arguments do not detract from the validity of plaintiffs' expenses of removing the debris as legitimate elements of damages. The removal expenses of $22,172.08 are allowed.

The landfill charge of $5,265.90 is a legitimate and allowable expense.

With respect to the claim of Samuel Abramo for $1,700 and the claim of his brother John Abramo for $300, representing 40 hours at $50 per hour, it appears that Samuel Abramo's function was that of trustee or manager in performing the services which he rendered here. It appears that John Abramo who practices law with his brother Samuel Abramo merely served as a substitute for his brother as trustee during the absence of his brother Samuel. Arthur Krieger, son-in-law of Mrs. David Ploener, seeks to recover for 62 hours of service at $50 per hour. It must be borne in mind that the administration of the trust was in

the hands of the trustee. Mr. Krieger was not called upon to render professional certified public accountant or tax services in this connection. The services which both he and Messrs. Abramo rendered in this matter were administrative in nature to see that the property was properly cleared in order to meet the requirements of the law enforcement authorities. Accordingly, the services should be evaluated in that light. The total time charged to that service by Messrs. Abramo and Krieger is 102 hours. The function performed was finding a contractor who would remove the debris, finding a place which would receive the debris, seeing that the work progressed satisfactorily and placating the public officials so that no prosecution would result. I conclude that a proper allowance for those services is $3,500.

## IV.

Plaintiffs contend that in addition to compensatory damages they are entitled to punitive or exemplary damages.

Punitive or exemplary damages are allowed in an appropriate setting as punishment to the tort feasor when his wrongful act was committed wilfully or wantonly. *Riegel v. Aastad*, Del.Supr., 272 A.2d 715 (1970). They are awarded when the facts of a case demonstrate conduct on the part of the defendant which is of such extreme nature as to warrant punishment. Ibid; *McHugh v. Brown*, Del.Supr., 125 A.2d 583 (1956).

With respect to the debris which was left on the premises, considering the nature of the land and its condition and its use over the years and its condition at the time defendants commenced occupancy, and the usage which defendants made of the land with the consent of the owners, I conclude that a bona fide dispute existed as to whether defendants were required to remove all of the debris from the premises. Accordingly, I do not find that punitive or exemplary damages should be assessed against defendants. This, of course, recognizes that defendants are liable for the actual damages resulting from defendants' failure to remove the debris.

The reasoning which I have expressed with respect to the debris does not apply with respect to the fence. A part of the fence and posts were simply bulldozed out of position and left in mangled condition on the premises. The remainder was removed without any plan for future use. The only bona fide dispute which would have existed with respect to the fence would be whether defendants were entitled to remove the fence for use elsewhere or would be required to leave it in place. The bulldozing of the fence was sheer destruction. Accordingly, punitive damages are assessed against defendants with respect to the fence in the amount of $1,000.

## V.

By way of summary, damages are awarded against defendant Arthur Ploener as follows:

| | | |
|---|---|---|
| Removal of Debris | $22,172.08 | |
| New Castle County Landfill | 5,265.90 | |
| Services of Samuel Abramo, John Abramo and Arthur Krieger | 3,500.00 | |
| Cost of Replacing Fence | 1,000.00 | |
| Total Compensatory Damages | | $31,937.98 |
| Punitive Damages | | $ 1,000.00 |

The attorneys will confer with the Court concerning the extent of damages to be awarded against each corporate defendant.