# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SUSAN FRINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 9780-VCG |
| | ) |
| KERSEY HOMES, INC., a Delaware | ) |
| Corporation, LIVING ENTERPRISES, | ) |
| LLC, a Delaware Limited Liability | ) |
| Company, and NOELLE MCCOLGAN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Date Submitted: March 5, 2018
Date Decided: June 25, 2018

Dean A. Campbell, of LAW OFFICE OF DEAN A. CAMPBELL, P.A., Georgetown, Delaware, *Attorney for Plaintiff Susan Fringer*.

Richard E. Berl, Jr., of HUDSON, JONES, JAYWORK & FISHER, LLC, Lewes, Delaware, *Attorney for Defendants Living Enterprises, LLC and Noelle McColgan*.

GLASSCOCK, Vice Chancellor

The great advantage of the corporate form is that it permits investment and ownership without risk of personal liability for entity debt. This advantage has its limits, obviously. One such limitation is involved here. The corporation involved, Kersey Homes, found itself a defendant in a lawsuit based on fraud, in connection with an agreement to sell a modular home. At the time of the agreement, the company was moribund, and as the trial date approached, it had a single asset with value, the modular home at issue. In fact, by that time, Kersey Homes had caused the building to be placed on a permanent foundation, on a lot owned by another entity controlled by Kersey Homes' principals, Living Enterprises. Kersey Homes made what I find to have been a tactical decision. It treated the modular home as an asset no longer owned by Kersey Homes; created a bill of sale purporting to show transfer of the asset—two years previously—to a relative of the principals, in satisfaction of an old debt; and then defaulted on the fraud action. Kersey Homes' principals, I find, acted on the (misplaced) understanding that a judgment against the now-insolvent Kersey Homes would be beyond the reach of the resulting judgment creditors.

The survivor of the judgment creditors here, Susan Fringer, sued in this Court, on the belief that neither law nor equity would condone the behavior of Kersey Homes, or leave her without remedy. That belief was well-founded. This is my post-trial decision. I find that the "sale" of the modular home to the relative, the

grandmother of Noelle McColgan, the President of Kersey Homes, was a sham; that the home was transferred to the lot owner, Living Enterprises, when it was affixed to its lot; and that the latter transfer was fraudulent under Delaware's Uniform Fraudulent Transfer Act. Mrs. Fringer, accordingly, is entitled to levy on the property, and to receive the sales proceeds in an amount sufficient to satisfy her judgment against Kersey Homes. My reasoning follows.

## I. BACKGROUND

Trial took place over one day, during which seven witnesses gave live testimony. The parties submitted twenty-two exhibits. I give the evidence the weight and credibility I find that it deserves.[1]

*A. Factual Background*

### 1. The Fringers Buy Their Retirement Home

Plaintiff Susan Fringer lives in York, Pennsylvania.[2] In 2001, Susan[3] and her late husband Herbert bought a vacant lot in Beaver Dam Acres, a development in rural eastern Sussex County.[4] The Fringers planned to build their retirement home on the lot.[5]

---

[1] Citations to "PTO A," "PTO B," and "PTO C" refer to sections A, B, and C of the stipulated facts in the parties' joint pre-trial stipulation.

[2] Trial Tr. 79:24–80:1; Fringer Dep. 7:13–14.

[3] To the extent I use first names here, it is to avoid confusion; no disrespect is meant.

[4] Fringer Dep. 14:9–17. Herbert Fringer passed away in the course of this litigation.

[5] Trial Tr. 80:15–21.

Herbert retired in 2011, and in July of that year, he met with representatives of Defendant Kersey Homes, Inc., a designated builder for Beracah Homes, Inc., which manufactures modular homes.[6] The Kersey Homes representatives showed Herbert a model home located on the company's sales lot in Millsboro, Delaware.[7] On July 9, 2011, the Fringers agreed to buy the modular home Herbert had seen at the Kersey Homes lot for $210,795.[8] Per the agreement, Kersey Homes would clear the Fringers' lot, build the foundation, install the well and septic systems, and deliver and set the house.[9] Later, on March 17, 2012, the parties revised the terms of the agreement.[10] Under the new agreement, the Fringers would bear the costs of clearing the lot and installing the well, water, and septic systems, among other things.[11] Kersey Homes would still be responsible for building the foundation and setting the house.[12] The Fringers agreed to pay $184,230 under the revised agreement, which valued the modular home at $182,000.[13]

---

[6] Fringer Dep. 15:17–18; PTO A ¶¶ 2, 4. The Defendants respond to the first section of Susan Fringer's proposed factual findings as follows: "Defendants admit all of the facts proposed by the Plaintiff in this section (1-25). By way of further response, however, Defendants Living Enterprises and McColgan were not parties to th[e Superior Court] action, and as a result those facts are not binding on the Defendants here." Defs.' Resp. to Pl.'s Statement of Facts 7–8. I take this to mean that the Defendants stipulate to the facts in question.

[7] PTO A ¶ 4.

[8] *Id.* ¶ 5, B ¶ 1; JX 000011–12.

[9] PTO B ¶ 1; JX 000011–12.

[10] PTO B ¶ 2.

[11] *Id.*

[12] *Id.*

[13] *Id.* ¶¶ 2–3.

Unbeknownst to the Fringers, the modular home they purchased was the only one Kersey Homes owned.[14] Indeed, Kersey Homes' sole remaining assets at the time of sale were the modular home, an inoperable box truck,[15] and a modular office building.[16] The Fringers also did not know that, despite Kersey Homes' representations to the contrary, they were not buying a Beracah Homes-constructed home.[17] Instead, their house was built by Crest Homes.[18]

Kersey Homes was in dire financial straits when it contracted with the Fringers. The company was insolvent, and its tax returns reveal losses of $9,450 and $81,104 in 2011 and 2012, respectively.[19] Defendant Noelle McColgan was the President and Treasurer of Kersey Homes, and her father Graham Living was its Vice President and Secretary.[20] Graham was the sole owner of Kersey Homes, which Graham and his wife ran until Noelle took over as President in 2009.[21]

In the spring of 2012, after executing the revised agreement with Kersey Homes, the Fringers cleared the lot and installed the well and septic systems.[22] That summer, the parties began to argue over several issues, including Kersey Homes'

---

[14] Trial Tr. 50:4–11, 82:1–4. "Kersey Home" would have been a more accurate corporate moniker.
[15] Kersey Homes was later able to fix the box truck and sell it, though just "[b]arely." *Id.* at 49:10–12.
[16] *Id.* at 45:22–46:7.
[17] PTO A ¶¶ 3, 6, 12.
[18] *Id.* ¶ 12.
[19] Trial Tr. 45:17–27; PTO B ¶ 10.
[20] PTO B ¶¶ 18, 20.
[21] Trial Tr. 100:16–18; McColgan Dep. 13:5–21.
[22] PTO A ¶ 8.

delay in starting work, difficulties encountered by the company in constructing the foundation, and "credits for appliances."[23] In July 2012, Kersey Homes informed the Fringers that they needed to pay an additional $4,323.75 to complete the foundation.[24] The Fringers refused to pay, and Kersey Homes ceased working on the project.[25] Around this time, Herbert visited the lot and discovered that the foundation could not be used for the modular home.[26] Specifically, the crawlspace was dug too deep, and parts of the foundation had not been closed properly.[27] Herbert reached out to Beracah Homes for help in resolving the parties' disputes; in the course of these discussions, he learned—to his surprise—that he and his wife had not, in fact, purchased a Beracah modular home.[28]

By this time, the Fringers had paid Kersey Homes $48,307.50.[29] While the parties' disputes continued, Kersey Homes sent yet another revised agreement to the Fringers, threatening to keep their money and leave the project unfinished unless

---

[23] *Id.* ¶ 9.
[24] *Id.* ¶ 10.
[25] *Id.* ¶ 11.
[26] *Id.* ¶ 13.
[27] *Id.* Noelle McColgan testified at trial that Kersey Homes hired an engineer to identify problems with the foundation, and that a suitable foundation was eventually installed. Trial Tr. 107:14–24.
[28] PTO A ¶ 12. It is clear from the record that the Fringers believed that Beracah modular homes were materially superior to Crest-built homes. That assertion is not pertinent here, and I make no such finding.
[29] *Id.* ¶ 14. According to Noelle McColgan, most of this money was paid to vendors hired to (i) assist in delivering the modular home to the Fringers' lot, and (ii) prepare the foundation on the Fringers' lot. Trial Tr. 116:24–122:14; *see also* JX 000022–23.

they signed the new contract.[30] The Fringers acquiesced and signed the agreement, which Kersey Homes backdated to July 9, 2011—the date of the original contract.[31]

### 2. Kersey Homes Tries (and Fails) to Deliver the House, and Noelle and Ruth Ann Purportedly Strike a Deal

Despite the parties' continuing disagreements, Kersey Homes attempted to deliver the home on August 9, 2012.[32] Noelle McColgan testified that the parties had chosen August 9 as the date for delivery, though Susan Fringer claims she did not know Kersey Homes intended to deliver the house on that date.[33] In any event, Kersey Homes tried to call the Fringers on August 9, but they did not answer the phone.[34] Surprisingly, that did not stop Kersey Homes from trying to deliver the house.[35]

The attempted delivery did not go well. As the modular home was being broken up into sections for delivery, an unexpected rainstorm hit.[36] Because the house was unwrapped and split into sections, the interior was exposed to the elements.[37] Once the storm arrived, the house was wrapped in plastic to keep water out, but these efforts did not prevent the house from suffering water damage.[38] In

---

[30] PTO A ¶ 15. The parties have not set forth the terms of this revised contract.
[31] *Id.* ¶ 16.
[32] Trial Tr. 57:3–7, 111:23–114:10.
[33] *Id.* at 94:23–95:1, 111:23–112:6.
[34] Trial Tr. 112:15–113:14; JX 000021.
[35] Trial Tr. 139:23–140:5.
[36] *Id.* at 110:20–111:10.
[37] McColgan Dep. 45:13–17.
[38] Trial Tr. 113:15–114:10.

addition, when the modular home was removed from the Kersey Homes' lot, the foundation it sat on was damaged.[39] Thus, because the house could not be replaced on the Kersey Homes foundation, it was left on the flatbed trucks that had been hired to transport the home to the Fringers' lot.[40] Oddly, the house was allowed to sit on the truck beds for months.[41]

Meanwhile, Kersey Homes continued its efforts to get in touch with the Fringers, to no avail.[42] On August 13, the Fringers' attorney informed Kersey Homes of the Fringers' belief that the contract was void as a result of the company's "fraud and defective workmanship."[43] On August 17, Noelle McColgan wrote a letter to the Fringers, informing them that due to "unexpected rainfall," installation of the home had been delayed, but that Kersey Homes was ready to set the home at a mutually convenient time.[44]

Once it became clear that the Fringers would not accept the modular home, Kersey Homes reached out to several individuals who had previously expressed interest in the house.[45] These contacts were not fruitful, as the house had sustained water damage during the storm, making it "very undesirable," in Noelle McColgan's

---

[39] *Id.* at 116:7–13.
[40] *Id.* at 116:9–10.
[41] McColgan Dep. 46:12–47:6.
[42] Trial Tr. 114:11–21; JX 000021.
[43] PTO B ¶ 7.
[44] JX 000053.
[45] Trial Tr. 115:17–21.

words.[46]  Moreover, not long after the unexpected rainstorm on August 9, Hurricane Sandy hit, causing additional damage to the modular home.[47]

Noelle McColgan testified that, around this time, she struck a deal with her grandmother, Ruth Ann Kersey.[48]  Earlier, in 2011, Ruth Ann had loaned $350,419 to Kersey Homes in exchange for a promissory note.[49]  Noelle was personally liable for the note, on which Kersey Homes regularly paid interest (but not principal, apparently).[50]  Soon after the surprise storm on August 9, 2012, Noelle supposedly agreed to transfer the modular home to her grandmother in exchange for a $75,000 reduction in Kersey Homes' debt.[51]  Noelle testified that $75,000 represented the value she and Ruth Ann placed on the house when the deal was struck; Noelle claimed that the figure came from a contractor named Paul Harris, who performed repairs on the home.[52]  In addition to this immediate debt reduction, a portion of the proceeds from an anticipated sale of the house in the future would go toward paying down the debt.[53]  In the final piece of this purported arrangement, the modular home

---

[46] *Id.* at 115:21–24.
[47] *Id.* at 122:24–123:4.
[48] *Id.* at 122:15–126:15.
[49] JX 000054.
[50] Trial Tr. 51:22–24, 54:22–55:4; JX 000056–58.
[51] Trial Tr. 123:12:126:15.
[52] *Id.* at 71:16–72:1.  Harris did not testify at trial.
[53] *Id.* at 126:7–11.

would be set on a lot belonging to Living Enterprises, LLC, a company owned by Noelle, her husband John McColgan, and her father.[54]

According to Noelle, it did not occur to her at the time to take any steps to document this transaction.[55] Indeed, there is no contemporaneous documentation of the deal purportedly struck between Noelle and her grandmother in 2012.[56] In any event, in or around April 2013, the modular home was moved to a permanent foundation on one of Living Enterprises' lots.[57] There is no written agreement between Living Enterprises and Kersey Homes reflecting this arrangement, and Living Enterprises did not pay anything for the house.[58] Between May 2013 and January 2014, Kersey Homes spent about $102,000 on repairs to the modular home.[59] Most of these repairs were covered by insurance proceeds paid to Kersey Homes.[60]

### 3. The Fringers Sue Kersey Homes in Superior Court, and Noelle and Ruth Ann Execute a Bill of Sale

On December 17, 2012, the Fringers brought suit against Kersey Homes in Delaware Superior Court, alleging breach of contract, common-law fraud, breach of

---

[54] *Id.* at 56:2–5, 125:19–23.
[55] *Id.* at 129:21–130:2.
[56] *Id.* at 149:15–150:2.
[57] *Id.* at 58:4–10.
[58] *Id.* at 70:7–18.
[59] *Id.* at 58:11–59:6; PTO B ¶ 33.
[60] PTO B ¶¶ 32–33; JX 000024–52.

warranty, and violations of the Delaware Consumer Fraud Act.[61]  The crux of the lawsuit was that Kersey Homes had misled the Fringers into believing they were buying a Beracah home when, in fact, the home they bought was built by Crest Homes.[62]  The Fringers sought $144,922.50 in damages, plus interest and reasonable attorneys' fees.[63]  The damages figure was triple the amount the Fringers had paid to Kersey Homes in connection with the contract to purchase the modular home. The reason is that Delaware law provides treble damages for victims of consumer fraud who are sixty-five years of age or older when the violation occurs.[64]  Since the Fringers were over sixty-five years old when they were defrauded by Kersey Homes, they were entitled to treble damages.[65]

Kersey Homes initially defended the lawsuit, filing an answer and counterclaim on January 30, 2013.[66]  It was not until the May 15, 2014 pre-trial conference that counsel for Kersey Homes announced that the company would stop defending the suit.[67]  Thus, on June 6, 2014, the Superior Court entered judgment against Kersey Homes on the claims for common-law fraud, consumer fraud, breach

---

[61] PTO B ¶ 13.

[62] *Id.* A ¶¶ 17–22.  The Fringers also sought recovery for the defective foundation on their lot.  *Id.* A ¶ 13.

[63] *Id.* B ¶ 13.

[64] 6 *Del. C.* § 2583(b).

[65] PTO A ¶ 24.

[66] JX 000007.

[67] PTO B ¶ 14.

of contract, and breach of warranty.[68]   The judgment awarded the Fringers $144,922.50 in damages, along with pre-judgment interest and attorneys' fees in the amount of $9,377.[69]

Notably, on April 1, 2014—well over a year into the litigation, approximately one month before the pre-trial conference in Superior Court, and two months before judgment was entered—Kersey Homes and Ruth Ann Kersey executed a "bill of sale," theoretically reflecting the transfer of the modular home to Ruth Ann in exchange for discharging $75,000 of the debt Kersey Homes owed to her.[70]  Noelle McColgan signed the bill of sale on behalf of Kersey Homes.[71]  According to Noelle, $75,000 represented the value of the home back in 2012, when the transfer memorialized in the bill of sale supposedly took place.[72]   Again, there is no contemporaneous documentation of the deal purportedly struck between Noelle and her grandmother in 2012.[73]  Noelle testified that the idea to execute the belated bill of sale did not come from anyone at Kersey Homes.  The idea came solely and unexpectedly from Noelle's grandmother, Ruth Ann.[74]  Oddly, Ruth Ann never told

---

[68] JX 000001.

[69] *Id.*

[70] JX 000059.

[71] *Id.*; Trial Tr. 75:1–5.

[72] Trial Tr. 73:12–74:10.  Susan Fringer's expert opined that, as of March 2017, the modular home was worth around $200,000.  JX 000223.  He also testified that the house was worth the same amount back in April 2014.  Trial Tr. 22:7–15.

[73] Trial Tr. 74:14–17.

[74] *Id.* at 130:16–19.

11

Noelle why she wanted the sale in writing almost two years after the underlying transaction purportedly took place.[75] At trial, Noelle's "best guess" was that her grandmother was "doing some work to her will."[76]

### 4. Kersey Homes Goes Out of Business, Ruth Ann Passes Away, and Noelle Gets the House

In February 2013, Kersey Homes went out of business, though it did not file a certificate of dissolution until October 2014.[77] Nobody from Kersey Homes informed the Fringers of these developments.[78] Later, on April 20, 2015, Ruth Ann passed away.[79] Ruth Ann's estate included a testamentary trust, under which Noelle was to receive 18% of the trust principal.[80] Noelle's share was reduced by her debt to Ruth Ann, which the trust agreement valued at $925,000.[81] That debt included the face value of the $350,419 note, even though Kersey Homes had purportedly paid down a portion of the note by transferring the modular home to Ruth Ann.[82] In other words, despite Noelle's guess that the belated bill of sale was demanded by Ruth Ann for purposes of estate work, the estate did not recognize a reduction in Kersey Homes' debt to Ruth Ann. Moreover, the estate inventory described the note

---

[75] *Id.* at 130:20–22.
[76] *Id.* at 130:23–131:1.
[77] PTO B ¶ 31, C ¶ 1.
[78] *Id.* B ¶ 31, C ¶ 2.
[79] JX 000062.
[80] JX 000077.
[81] *Id.*
[82] Trial Tr. 157:5–24.

as having "no value," apparently because Kersey Homes was insolvent and could not pay the debt.[83]  Finally, Noelle purportedly took the modular home from the estate as part of her distribution, though there is no contemporaneous documentary evidence of this transaction.[84]

*B. This Litigation*

The Fringers commenced this action on June 18, 2014, about two weeks after they had obtained the judgment against Kersey Homes in Superior Court.  The Complaint names Kersey Homes, Living Enterprises, Noelle McColgan, and Ruth Ann Kersey as Defendants.  The Complaint contains six counts.  Count I is brought against Living Enterprises, and it seeks the imposition of a constructive trust.[85]  Count II seeks an injunction to rescind Kersey Homes' transfer of the modular home, which the Complaint characterizes as a fraudulent conveyance.[86]  Count III alleges unjust enrichment, Count IV seeks to pierce the corporate veil with respect to Living Enterprises and Kersey Homes, Count V alleges that Noelle committed fraud as an officer of Kersey Homes, and Count VI is brought against Kersey Homes, Noelle, and Living Enterprises for conspiring to defraud the Fringers.[87]  Kersey Homes has

---

[83] *Id.* at 156:7–15; JX 000065.
[84] Trial Tr. 35:18–36:14, 158:1–11, 160:8–20.  As noted above, Noelle was entitled to 18% of Ruth Ann's residuary estate.
[85] Compl. ¶¶ 23–28.
[86] *Id.* ¶¶ 29–32.
[87] *Id.* ¶¶ 33–49.

13

not appeared to defend this litigation, having dissolved in October 2014; Ruth Ann Kersey was voluntarily dismissed from the action on June 16, 2016.

Susan Fringer moved for summary judgment on July 18, 2016, and I denied the Motion on February 1, 2017. Trial was held on July 25, 2017, after which I received post-trial briefing, including supplemental statements of facts from the parties. In her post-trial briefing, Fringer asks the Court to find that Kersey Homes' transfer of the modular home to Living Enterprises was a fraudulent conveyance. Fringer also argues that, even if the transfer was not a fraudulent conveyance, the Court should nevertheless impose a constructive trust to remedy the Defendants' unjust enrichment. Fringer further claims she has established that Kersey Homes and Living Enterprises engaged in civil conspiracy by taking steps to place the modular home beyond the reach of the Fringers. Finally, Fringer seeks fee-shifting for the Defendants' bad-faith and fraudulent conduct.

The Defendants respond that Fringer has failed to establish a fraudulent transfer, either by proving actual intent to defraud or by demonstrating constructive fraud. Specifically, the Defendants argue that no intent to defraud can be inferred from Kersey Homes' decision, soon after the failed delivery attempt on August 9, 2012, to transfer the house to Ruth Ann Kersey in exchange for reducing Kersey Homes' debt to Ruth Ann by $75,000. The Defendants also assert that this transfer

14

was for reasonably equivalent value, that Ruth Ann Kersey was a good-faith purchaser, and that the Defendants were not unjustly enriched by their conduct.

## II. ANALYSIS

*A. When was the Modular Home Transferred?*

Before deciding whether Fringer has proven that Kersey Homes fraudulently transferred the modular home, I must address a threshold question: Did Kersey Homes transfer the house to Ruth Ann Kersey soon after the surprise storm in August 2012, or did the company transfer the property to Living Enterprises in or around April 2013? If Kersey Homes sold the house to Ruth Ann Kersey in 2012 in exchange for reducing the company's debt to her by $75,000, then I would need to analyze whether that transaction constituted a fraudulent transfer. In conducting this analysis, the placement of the house on the Living Enterprises lot would arguably be irrelevant. If, on the other hand, the sale to Ruth Ann never took place, and Kersey Homes instead transferred the property to Living Enterprises by affixing it to that company's lot in 2013, then the analysis would focus on whether that conveyance was fraudulent. Assuming that is what happened, the bill of sale executed in 2014 between Kersey Homes and Ruth Ann did not transfer title to the modular home, both because the house at that point belonged to Living Enterprises, not Kersey

15

Homes,[88] and because the bill of sale memorialized a non-existent oral agreement purportedly reached almost two years earlier.

In my view, Fringer proved at trial that the purported sale to Ruth Ann back in 2012 did not actually take place. First, there is no contemporaneous documentary evidence corroborating Noelle McColgan's testimony that, soon after the unexpected rainstorm in August 2012, she reached an agreement with Ruth Ann to transfer the modular home to her in exchange for debt reduction. Indeed, other than Noelle herself, no witness testified to the existence of this oral agreement. Noelle's testimony on this subject struck me as self-serving and litigation-driven, especially in light of the lack of any corroborating evidence.

It is among the most awesome responsibilities of a trial judge to evaluate the credibility of witness testimony. I must examine testimony and resolve it with other evidence of record, giving credibility to the testimony where possible. Nonetheless, I find Noelle's testimony as to the transfer to Ruth Ann not credible. My rejection of this part of her testimony is in light of the events that followed the Fringers' initiation of the Superior Court litigation. While Kersey Homes initially defended the lawsuit, its counsel indicated at the May 15, 2014 pre-trial conference that the company would stop actively litigating the case. Accordingly, less than a month

---

[88] *See Barlow v. Stevenson*, 2000 WL 33653412, at *2 (Del. Com. Pl. July 19, 2000) ("The general legal rule is [the] maxim *Nemo dat qui non habet* (No one gives which he does not possess)." (emphasis omitted)).

16

later, the Superior Court entered judgment against Kersey Homes, awarding the Fringers $144,922.50 in damages for statutory and common-law fraud, breach of contract, and breach of warranty.[89]  A mere two months before this judgment was entered, Kersey Homes and Ruth Ann Kersey executed the bill of sale, which purportedly memorialized the deal struck by the parties back in 2012.  Noelle testified that, notwithstanding that timing, the execution of the bill of sale was at Ruth Ann's (never explained) request.  Convenient, if true.

To my mind, however, there is a more likely explanation for this sequence of events: Kersey Homes' principals, realizing they might be on the hook for over $100,000 dollars, decided to take steps to evade any judgment obtained by the Fringers.  When the bill of sale was executed in April 2014, Kersey Homes was out of business and insolvent, so the Fringers could not reach into its assets to satisfy a judgment.  But around April 2013, Kersey Homes' only asset of value—the modular home—had been transferred to Living Enterprises for no consideration.  Knowing that the Fringers could plausibly characterize that transaction as a fraudulent conveyance, Kersey Homes' principals decided to cover their tracks.  They concocted the story about the transfer to Ruth Ann back in 2012, and they attempted to provide documentary support for that agreement by executing the bill of sale.  Having papered a transaction that looked less like a fraudulent conveyance than did

---

[89] The judgment also awarded pre-judgment interest and attorneys' fees in the amount of $9,377.

17

the Living Enterprises arrangement, Kersey Homes defaulted in Superior Court, leaving the Fringers unable to execute on the judgment they would obtain there—or so Kersey Homes, I find, thought.

Thus, the relevant transaction for purposes of analyzing whether a fraudulent conveyance took place is the transfer of the modular home from Kersey Homes to Living Enterprises, which took place around April 2013.[90] At that time, Kersey Homes placed the house on a permanent foundation on one of Living Enterprises' lots. Kersey Homes and Living Enterprises did not execute a written agreement memorializing this arrangement. Nonetheless, under the law of fixtures, Kersey Homes transferred ownership of the property to Living Enterprises by installing the modular home on the Living Enterprises lot.

"A fixture is an article which, though originally a chattel, is, by reason of its annexation, regarded as a part of the land, partaking of the character of realty and, ordinarily, belonging to the owner of the land."[91] "To determine whether or not a chattel has become a fixture, the Court must look at 'the intention of the party making the annexation as disclosed by the surrounding circumstances.'"[92] The Court considers several factors in ascertaining intent, including "the nature of the

_____

[90] This finding moots Fringer's motion in limine, which asked the Court to hold that the purported transfer to Ruth Ann Kersey was irrelevant, and that therefore evidence regarding the alleged transfer was inadmissible.

[91] *Warrington v. Hignutt*, 31 A.2d 480, 481 (Del. Super. 1943).

[92] *JJID, Inc. v. Del. River Indus. Park, LLC*, 2007 WL 2193735, at *3 (Del. Super. July 30, 2007) (quoting *Wilmington Hous. Auth. v. Parcel of Land*, 219 A.2d 148, 150 (Del. 1966)).

chattel, the mode of its annexation, the purpose or use for which the annexation has been made, and the relationship of the annexor to the property."[93] "Considerable weight should be given to the fact that the person making the attachment is the owner of the realty since an owner is more likely to intend permanency than one only temporarily in possession of the premises."[94] "No one factor is necessarily controlling," though, and "[t]he true test . . . is whether or not the chattel was affixed to the realty for a temporary or a permanent purpose."[95]

In this case, the modular home became a fixture belonging to Living Enterprises when Kersey Homes moved it to the Living Enterprises lot.[96] Several considerations support this conclusion. To begin, a dwelling is, perhaps, the quintessential fixture. Here, the house was attached to a permanent foundation on the lot.[97] The purpose of placing the modular home on the lot was to allow people to live there. Indeed, the home is currently being rented out to individuals who reside on the property.[98] Moreover, while Kersey Homes and Living Enterprises were

---

[93] *Parcel of Land*, 219 A.2d at 150.
[94] 36A C.J.S. *Fixtures* § 6 (2018).
[95] *Parcel of Land*, 219 A.2d at 150.
[96] *See* 35A Am. Jur. 2d *Fixtures* § 52 (2018) ("[W]hen a manufactured home is permanently affixed to the land and becomes stationary, it may . . . become a fixture.").
[97] *See Hartford Nat'l Bank & Trust Co. v. Godin*, 398 A.2d 286, 287 (Vt. 1979) ("The trial court concluded, we think correctly, that the mobile home became a fixture with its installation on the mortgaged premises. Clear intent to make it part of the realty was evidenced by a concrete block foundation, attached steps, a connected septic system, and encasement of the foundation in aluminum foundation siding.").
[98] Trial Tr. 78:16–20.

distinct entities, the former was solely owned by Graham Living, and the latter was owned by Noelle McColgan, her husband, and Graham, her father. The transfer was therefore between related parties. Taken together, these facts establish that Kersey Homes' intent in placing the modular home on Living Enterprises' lot was to make it a permanent part of the land. Accordingly, once the house was installed on the lot, it became the property of Living Enterprises.[99]

Because Living Enterprises owned the home as of spring 2013, it was the only entity that could dispose of the property from that point on. For that reason, the bill of sale executed by Kersey Homes and Ruth Ann Kersey in April 2014 did not transfer title to the modular home.[100] The bill of sale also failed to convey title because it purported to memorialize an oral agreement that was never actually reached. Thus, having established that the modular home passed from Kersey Homes to Living Enterprises in or around April 2013, I must determine whether that transfer constituted a fraudulent conveyance. I turn to that question now.

### B. Was the Transfer a Fraudulent Conveyance?

The Delaware Uniform Fraudulent Transfer Act ("DUFTA") "provides remedies to creditors who are defrauded by debtors who transfer assets or incur

---

[99] *See* 36A C.J.S. *Fixtures* § 1 ("[A] 'fixture' is an article of the nature of personal property that has been so annexed to the realty that it is regarded as part of the land and partakes of legal incidents of the freehold and belongs to the person owning the land.").

[100] *See Barlow*, 2000 WL 33653412, at *2 ("The general legal rule is [the] maxim *Nemo dat qui non habet* (No one gives which he does not possess)." (emphasis omitted)).

obligations '[w]ith actual intent to hinder, delay or defraud any creditor of the debtor,' or, in certain circumstances, '[w]ithout receiving reasonably equivalent value.'"[101] DUFTA defines a "creditor" as "a person who has a claim."[102] "Claim," in turn, is defined broadly to include "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."[103] "In an action to set aside a fraudulent conveyance the burden is on the creditor to prove that the conveyance was fraudulent."[104]

Under Section 1304(a)(1) of DUFTA,

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation

(1) With actual intent to hinder, delay or defraud any creditor of the debtor.[105]

Section 1304(b) provides a non-exclusive list of factors to consider "[i]n determining actual intent under paragraph (a)(1)."[106] The factors include whether:

(1) The transfer or obligation was to an insider;

---

[101] *August v. August*, 2009 WL 458778, at *10 (Del. Ch. Feb. 20, 2009) (alterations in original) (quoting 6 *Del. C.* § 1304(a)).
[102] 6 *Del. C.* § 1301(4).
[103] *Id.* § 1301(3).
[104] *Duffield Assocs., Inc. v. Lockwood Bros., LLC*, 2017 WL 2954618, at *3 (Del. Ch. July 11, 2017) (quoting *United States v. West*, 299 F. Supp. 661, 663 (D. Del. 1969)).
[105] 6 *Del. C.* § 1304(a)(1).
[106] *Id.* § 1304(b).

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[107]

"It is not necessary that all of the factors support a finding of actual intent. Rather, the confluence of several factors in one transaction generally provides conclusive evidence of an actual intent to defraud."[108]

---

[107] *Id.*

[108] *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *14 (Del. Ch. Oct. 10, 2014) (citation and internal quotation marks omitted).

Here, at least seven of the Section 1304(b) factors support a finding of actual intent to defraud. Kersey Homes retained control of the modular home after it was transferred to Living Enterprises in the spring of 2013.[109] Indeed, between May 2013 and January 2014, Kersey Homes spent approximately $102,000 on repairs to the house, and the repair money came mostly from insurance proceeds paid to Kersey Homes. Next, the transfer was not disclosed to the Fringers, even though (i) they had initiated suit against Kersey Homes only a few months before the house was moved to the Living Enterprises lot, and (ii) Kersey Homes was still litigating the case at the time of transfer.[110] These two facts point to another factor supporting a finding of actual intent: Before the house was transferred, Kersey Homes had been sued by the Fringers.[111] In addition, because Kersey Homes' only significant assets at the time of transfer were an inoperable box truck and the modular home, the transfer was of substantially all the company's assets.[112] And, by transferring the house to Living Enterprises, Kersey Homes "removed . . . [an] asset[]."[113] It is undisputed that Living Enterprises paid nothing for the modular home, which Noelle McColgan testified was worth $75,000 after the damage caused by the surprise storm and Hurricane Sandy, and was, obviously, worth far more after the insurance-funded

---

[109] *See 6 Del. C.* § 1304(b)(2).
[110] *See id.* § 1304(b)(3).
[111] *See id.* § 1304(b)(4).
[112] *See id.* § 1304(b)(5).
[113] *Id.* § 1304(b)(7).

repairs. Thus, the consideration Kersey Homes received for the house was not "reasonably equivalent to the value of the asset transferred."[114] Finally, Kersey Homes was insolvent at the time of transfer.[115]

Taken together, these factors convince me that, in transferring the modular home to Living Enterprises, Kersey Homes acted with actual intent to hinder, delay, and defraud the Fringers, who had become creditors of the company when it defrauded them back in 2011 and 2012.[116] Thus, Kersey Homes violated Section 1304(a)(1) of DUFTA.

Kersey Homes also violated Section 1305(a), which provides that

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[117]

---

[114] *Id.* § 1304(b)(8).

[115] *See id.* § 1304(b)(9). Furthermore, while Living Enterprises was not technically an "insider" under the categories set forth in Section 1301(7)(b), those categories are not exhaustive. "[A]n 'insider' is generally defined as the parties set forth on the list [contained in Section 1301(7)] *or* someone that has a close enough relationship to the party which warrants closer scrutiny by the Court." *News Journal Co. v. Little Caesars of Del., Inc.*, 2000 WL 33653432, at *2 (Del. Com. Pl. Oct. 20, 2000) (emphasis added). Kersey Homes was run by Noelle McColgan, whose father (Graham Living) was the sole owner. Living Enterprises was owned by Noelle, Graham, and Noelle's husband. Thus, the relationship between these two entities was "sufficiently close . . . that [Kersey Homes'] conduct is . . . subject to scrutiny more than those dealing at arm's length with [the company]." *Id.* (quoting *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996)).

[116] *See* 37 C.J.S. *Fraudulent Conveyances* § 47 (2018) ("The relationship of debtor and creditor arises in tort cases the moment the tort cause of action accrues, meaning that the tort claimant becomes a creditor at the time the tort injury is sustained, not when a tort suit is filed or a damage judgment is obtained." (footnote omitted)).

[117] 6 *Del. C.* § 1305(a).

24

"[A] cause of action under Section 1305(a) will exist if (i) the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange, (ii) the debtor was insolvent at the time of or rendered insolvent by the transfer, and (iii) the plaintiff was a creditor at the time of the transfer."[118]

In this case, I find that Kersey Homes transferred the modular home to Living Enterprises for no consideration, even though Noelle McColgan valued the house at $75,000 after the storms hit (but before the repairs were made). Thus, Kersey Homes did not receive reasonably equivalent value for the home. It is also undisputed that Kersey Homes was insolvent at the time of transfer. And the Fringers were creditors of Kersey Homes in the spring of 2013, when the house was moved to a permanent foundation on the Living Enterprises lot. Thus, Fringer proved at trial that Kersey Homes committed a fraudulent transfer under Section 1305(a) of DUFTA.[119]

---

[118] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 199 (Del. Ch. 2014).

[119] In addition, even if I credited Noelle McColgan's testimony about the deal she purportedly struck with her grandmother in 2012, Fringer would still be able to establish a fraudulent transfer under Section 1304(a)(1). As a relative of Kersey Homes' President, Ruth Ann Kersey was an insider for purposes of DUFTA. *See* 6 *Del. C.* § 1301(7)(b)(6). For the reasons discussed above, Kersey Homes continued to exercise control over the modular home after the purported sale. The transfer was not disclosed, and the modular home was Kersey Homes' only valuable asset in the fall of 2012. Finally, Kersey Homes was insolvent when Ruth Ann supposedly agreed to accept the modular home. The confluence of these factors makes it more likely than not that, even assuming it took place, the purported deal between Kersey Homes and Ruth Ann was entered into with actual intent to defraud the Fringers.

*C. Conspiracy*

Fringer asks the Court to find that Kersey Homes and Living Enterprises engaged in a conspiracy to fraudulently transfer the modular home.[120] Under Delaware law, however, "a conspiracy cannot be predicated on fraudulent transfer."[121] Thus, I decline to hold Kersey Homes and Living Enterprises liable for conspiracy.

*D. Remedy*

Having found that Kersey Homes fraudulently transferred the modular home, I turn next to task of crafting an appropriate remedy. "DUFTA contemplates remedies that include the '[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.'"[122] DUFTA also provides for "attachment or [any] other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable law."[123] Moreover, "[i]f a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its

---

[120] *See* Pl.'s Opening Post-Trial Br. 13 ("All the elements of civil conspiracy are satisfied. Two (2) fictional entities engaged in conduct whereby the objective was to conceal, or otherwise make unreachable, Kersey's single largest asset from the reach of the Fringer's judgment.").

[121] *Quadrant Structured Prods. Co., Ltd.*, 102 A.3d at 203 (citation and internal quotation marks omitted); *accord Edgewater Growth Capital Partners, L.P. v. H.I.G. Capital, Inc.*, 2010 WL 720150, at *2 (Del. Ch. Mar. 3, 2010) ("[T]he Delaware Fraudulent Transfer Act does not create a cause of action for aiding and abetting, or conspiring to commit, a fraudulent transfer.").

[122] *Lake Treasure Holdings, Ltd.*, 2014 WL 5192179, at *15 (quoting 6 *Del. C.* § 1307(a)(1)).

[123] 6 *Del. C.* § 1307(a)(2).

26

proceeds."[124] "In addition to [these] specific remedies . . . , the statute provides that, '[s]ubject to applicable principles of equity . . . [a defrauded creditor may obtain] [a]ny other relief the circumstances may require.'"[125] Thus, "DUFTA grants a court 'broad latitude' . . . to craft a remedy to 'put a creditor in the position she would have been in had the fraudulent transfer not occurred.'"[126]

Fringer appears to seek an order permitting her to levy execution on the modular home. Indeed, Fringer argues that, but for the fraudulent transfer, she "would have filed a writ of execution in the Superior Court to seize and sell Kersey Homes' assets to satisfy the judgment."[127] As a judgment creditor, Fringer is entitled under DUFTA to levy execution on the modular home, which Fringer's expert valued at around $200,000 as of March 2017. Thus, I hold that Fringer may levy execution on the house in order to satisfy the entirety of the judgment she and her late husband obtained in Superior Court. Fringer has not made clear whether she believes she is entitled to sale of the property to which the house is affixed, and the record is silent as to whether, at this point, the house could be removed without significant destruction of value; I retain jurisdiction over this issue, should the parties be unable to resolve it. To the extent the house is encumbered by a lease, such lease

---

[124] *Id.* § 1307(b).

[125] *August*, 2009 WL 458778, at *10 (second, third, and fourth alterations in original) (quoting 6 *Del. C.* § 1307(a)(3)).

[126] *Lake Treasure Holdings, Ltd.*, 2014 WL 5192179, at *15 (quoting *August*, 2009 WL 458778, at *10).

[127] Pl.'s Opening Post-Trial Br. 2.

should be terminated as soon as its terms permit. Finally, the Defendants must account for rental receipts for the house. To the extent sale of the property is insufficient to satisfy the Fringers' judgment together with interest, the shortfall shall be made up from the rental receipts.

Finally, Fringer requests that the Defendants pay her legal fees incurred. In light of the fact that the judgment that I enforce here is based on exemplary treble damages, it would be inequitable to depart from the American Rule on fees. Accordingly, this request is denied.

## III.   CONCLUSION

For the foregoing reasons, I find that Kersey Homes' transfer of the modular home to Living Enterprises was a fraudulent conveyance in violation of DUFTA. Accordingly, Susan Fringer is entitled to levy execution on the house to satisfy the judgment she and her late husband obtained in Superior Court, together with interest. The parties should submit an appropriate form of order.